UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

No.  22-9546
_____

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner – Appellant*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY *et al.*,
*Respondent – Appellees*

_____

On Petition for Review of Final Action of the U.S. Environmental Protection
Agency
_____

### *CORRECTED* PETITIONER'S OPENING BRIEF
_____

Robert Ukeiley
Center for Biological Diversity
1536 Wynkoop St., Ste. 421
Denver, Colorado 80202
720-496-8568
rukeiley@biologicaldiversity.org
Attorney for Petitioner
Center for Biological Diversity

Ryan Maher
Center for Biological Diversity
1411 K St., Ste. 1300
Washington, DC 20002
781-325-6303
rmaher@biologicaldiversity.org
Attorney for Petitioner
Center for Biological Diversity

\* Oral argument is requested

## CORPORATE DISCLOSURE STATEMENT

The Center for Biological Diversity ("Center") has no parent companies, and there are no publicly traded companies that have any ownership interest in the Center.

**TABLE OF CONTENTS**

STATEMENT OF RELATED CASES...............................................................v
GLOSSARY OF ACRONYMS AND ABBREVIATIONS ..............................v
INTRODUCTION...............................................................................................1
BASIS OF JURISDICTION ..............................................................................5
STATEMENT OF THE ISSUES........................................................................8
STATEMENT OF THE CASE............................................................................9
   I.    Clean Air Act .......................................................................................9
   II.   The Ozone NAAQS ........................................................................ 12
   III.  Colorado's SIP Revisions ............................................................. 14
STANDARD OF REVIEW............................................................................. 14
SUMMARY OF THE ARGUMENT ............................................................. 16
ARGUMENT .................................................................................................. 20
   I.    The Court must remand this matter to EPA and require EPA to hold a
       new public comment period after it puts the regulatory provisions it is
       proposing to approve in the rulemaking docket. .................................... 20
   II.   The Court must overturn EPA's approval of the Colorado's permitting
       program because the program ignores dangerous pollution from certain
       sources............................................................................................................. 28
       A. EPA must disapprove the Colorado permitting program because it
          improperly excludes "temporary emissions" from the determination of
          whether a source is a major source for permitting purposes. ................. 29
       B. EPA must disapprove the Colorado permitting program because it
          improperly excludes emissions from internal combustion engines on a
          vehicle from the determination of whether a source is a major source
          for permitting purposes. ........................................................................... 38
CONCLUSION ............................................................................................... 40
ORAL ARGUMENT STATEMENT ............................................................ 40
CERTIFICATE OF SERVICE........................................................................ 42
CERTIFICATE OF DIGITAL SUBMISSION ............................................ 42
CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.............................. 43
ATTACHMENT 1: US EPA Final Rule on Direct Appeal (May 13, 2022)
ATTACHMENT 2: Declaration of Scott Silber (Oct. 31, 2022)
ATTACHMENT 3: Declaration of Richard Reading (Oct. 30, 2022)
ATTACHMENT 4: Declaration of Lori Ann Burd (Nov. 1, 2022)

## TABLE OF AUTHORITIES

**CASES**

*Alaska Dep't of Environmental Conservation v. EPA*
540 U.S. 461 (2004) ............................................................................................. 35

*Am. Med. Ass'n v. Reno*
57 F.3d 1129 (D.C. Cir. 1995) ........................................................................... 21

*Center for Biological Diversity et al., v. EPA*
22-cv-03309-RS (N.D. Cal.) ............................................................................... 13

*Chevron U.S.A. Inc. v. Nat Res. Def. Council, Inc.*
467 U.S. 837 (1984) ............................................................................................. 15

*EPA v. EME Homer City Generation L.P.*
134 S. Ct. 1584 (2014) ....................................................................................... 37

*Hunt v. Washington State Apple Advertising Comm'n*
432 U.S. 333 (1977). ............................................................................................. 6

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) ............................................................................................... 6

*Luminant Generation Co. v. EPA*
675 F.3d 917 (5th Cir. 2012) ............................................................................ 11

*Motor Vehicle Mfrs.  Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S 29 (1983) ............................................................................................... 15

*National Parks Conservation Association v. Tennessee Valley Authority*
2010 U.S. Dist. LEXIS 31682 (E.D. Tenn. 2010) ......................................... 27

*National Parks Conservation Association v. Tennessee Valley Authority*
618 F.Supp.2d 815 (E.D. Tenn 2009) ............................................................ 27

*New York v. Niagara Mohawk Power Corp.*
263 F.Supp.2d 650 (W.D.N.Y. Apr. 28, 2003) ............................................ 26

*Oklahoma v. EPA*
723 F.3d 1201 (10th Cir. 2013) ....................................................................... 14

*Olenhouse v. Commodity Credit Corp.*
42 F.3d 1560 (10th Cir.  1994) ........................................................................ 15

*Sierra Club v. EPA*
964 F.3d 882 (10th Cir. 2020) ................................................................... 11, 26

*Sierra Club v. US EPA*
964 F.3d 882 (10th Cir. 2020) ......................................................................... 30

*Tennessee Valley Auth. v. Hill*
437 U.S. 153 (1978) ............................................................................................. 31

*Vill. of Barrington v. Surface Transp. Bd.*
636 F.3d 650 (D.C. Cir. 2011) ......................................................................... 16

## STATUTES

42 U.S.C § 7410 ........................................................................................ 10
42 U.S.C. § 7408 ......................................................................................... 9
42 U.S.C. § 7409 ....................................................................................9, 10
42 U.S.C. § 7410 ....................................................................................... 10
42 U.S.C. § 7502 ............................................................................... 3, 10, 11
42 U.S.C. § 7511 ....................................................................................... 10
42 U.S.C. § 7511a ...................................................................................3, 10
42 U.S.C. § 7604 ....................................................................................... 25
42 U.S.C. § 7607 .....................................................................................5, 20
42 U.S.C. § 7661a ...................................................................................... 25
5 U.S.C. § 553 ........................................................................................... 21
5 U.S.C. § 706 ........................................................................................... 14

## RULES

75 Fed. Reg. 35,520 (June 22, 2010) ........................................................... 37
80 Fed. Reg. 65,291 (Oct. 26, 2015) .................................................... 1, 2, 12
83 Fed. Reg. 25,776 (June 4, 2018) .............................................................. 2
83 Fed. Reg. 31,068 (July 3, 2018) ............................................................. 12
83 Fed. Reg. 56,781 (Nov. 14, 2018) .......................................................... 13
84 Fed. Reg. 18,991 (May 3, 2019) ............................................................ 22
86 Fed. Red. 60,434 (Nov. 2, 2021) .................................................14, 23, 28
87 Fed. Reg. 29,232 (May 13, 2022) ..................................................... passim
87 Fed. Reg. 60,926 (Oct. 7, 2022) .........................................................2, 13

## REGULATIONS

40 C.F.R. § 1068.30 .................................................................................. 39
40 C.F.R. § 51.1314 ........................................................................25, 28, 30
40 C.F.R. § 51.165 ............................................................................... passim
40 C.F.R. § 70.2 ........................................................................................ 11
40 C.F.R. Pt. 50 (2020). ............................................................................ 12
40 C.F.R. Pt. 51, Appendix S ..................................................................... 35
5 CCR 1001-5, Pt. A, 1.B.31.b.(iii) .............................................................. 39
5 CCR 1001-5, Pt. D ................................................................................. 22
5 CCR 1001-5, Pt. D, II.A.23.f ...............................................................38, 39
5 CCR 1001-5, Pt. D, II.A.25.f ................................................................... 29

**STATEMENT OF RELATED CASES**

There are no prior cases or appeals that qualify as related cases.

**GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

Pursuant to 10th Circuit Rule 28.2(C)(4), the following is a glossary of

the acronyms used in this brief:

| | |
|---|---|
| EPA | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards |
| SIP | State Implementation Plan |

**INTRODUCTION**

This Clean Air Act direct appeal challenges the United States Environmental Protection Agency's ("EPA") approval of a Colorado state implementation plan ("SIP"). Colorado's SIP is the collection of EPA-approved regulations and directives used by Colorado to keep concentrations of dangerous pollutants in the ambient air below EPA's National Ambient Air Quality Standards ("NAAQS"). The NAAQS apply to a specific set of air pollutants which can endanger public health or welfare, including ground-level ozone, which people often refer to as "smog."

While ozone in the stratosphere, i.e., the ozone layer, is critical to protecting people from harmful ultraviolet rays, ground-level ozone is a dangerous air pollutant that attacks the lungs and other parts of the body, contributing to respiratory problems, cardiovascular issues, and premature deaths. *See* 80 Fed. Reg. 65,291, 65,302–17 (Oct. 26, 2015). The evidence is also suggestive of a causal relationship between exposure to ozone and adverse reproductive and developmental effects, including adverse birth outcomes. *Id.* at 65,338. Children, the elderly, people with respiratory conditions like asthma, and people who work or recreate outdoors are most at risk from ozone. *See id.* at 65,322. Ozone also damages commercial crops and other vegetation, harming the economy and diminishing ecosystem services—

1

the life-sustaining services that ecosystems provide to people for free, like

clean air, clean water, and carbon sequestration.  *Id.* at 65,372–73, 65,377–78.

Oil and gas development is a large cause of ozone pollution.[1]

In 2015, EPA adopted a more protective NAAQS for ozone.  *Id.* at 65,294.

EPA lowered the allowable level of ozone in the ambient air because EPA

deemed it necessary to protect public health and welfare across the country.

*Id.*

Upon adopting the new NAAQS, EPA determined that a large part of

Colorado had levels of ozone pollution that exceeded the NAAQS, rendering

this region a "nonattainment area" called the Denver Metro / North Front

Range nonattainment area ("Denver Metro Nonattainment Area").  83 Fed.

Reg. 25,776, 25,792 (June 4, 2018).  This came as no surprise, because this

area also continues to fail to meet the former, less-stringent ozone NAAQS

from 2008.[2]  87 Fed. Reg. 60,926, 60,929 (Oct. 7, 2022).  The Denver Metro

---

[1] *See* EPA, Basic Information about Oil and Natural Gas Air Pollution Standards
(accessed Oct. 25, 2022), https://www.epa.gov/controlling-air-pollution-oil-
and-natural-gas-industry/basic-information-about-oil-and-natural-gas; *see
also* Colorado Department of Public Health and Environment, Denver Metro
Area/North Front Range Nonattainment Area 2017 Emission Inventory,
Summary (June 18, 2020) (identifying oil and gas sources as the largest source
category for volatile organic compounds, one of the types of pollution that
results in ozone), ROA, Vol. I, at 0029–30.
[2] For reasons not relevant to this case, the Clean Air Act allows for multiple
NAAQS for the same pollutant which are implemented largely in parallel to

Nonattainment Area includes eight counties and part of another that, all together, are home to over 3.3 million Coloradans.  EPA, Green Book: 8-Hour Ozone (2015) Designated Areas by State/County/Area (Sept. 30, 2022), https://www3.epa.gov/airquality/greenbook/jbcty.html.

When EPA designated the Denver Metro Nonattainment Area in violation of the more protective 2015 ozone NAAQS, the Clean Air Act required Colorado to update its SIP.  42 U.S.C. § 7502.  The Act imposed additional obligations on Colorado to set the Denver Metro Nonattainment Area on a path towards attainment of the NAAQS.  *See id*. §§ 7502(c)(5), 7503, 7511a.  Pursuant to these obligations, Colorado was required to obtain EPA's approval for Colorado's permitting program for new or modified sources of air pollution that will emit ozone-causing pollution in the Denver Metro Nonattainment Area.  *Id*. §§ 7502(c)(5), 7503.  EPA's approval of these revisions is the subject of this direct appeal.

EPA, however, did not include the language of the permitting program it approved in the docket for its proposed rule.  Accordingly, the public, including the Center, was forced to guess at the specific language of the permitting program they were supposed to be commenting on.  Colorado has

---

each other until the nonattainment area comes into compliance, that is "attainment," with the older, less protective NAAQS.

3

made many changes to the language of the regulations that form its permitting

program over the more than half a century that the Clean Air Act's cooperative

federalism system has been in place.  Some of this language has been adopted

into the Colorado SIP, but some of it has not.  *See, e.g.*, ROA, Vol. 2, at 0991–92

(the "cross out" is the way EPA indicates to the public, including both

regulated entities and environmental groups, which language from Colorado's

state regulations is in the SIP and which language is not in the SIP).

EPA's refusal to provide the actual language of the Colorado permitting

program that is in the federally approved SIP deprived the public of the

opportunity to provide meaningful comments on the entirely of the permitting

program approved by EPA, contrary to basic principles of administrative law.

EPA's refusal was also counter to a goal of having the public help EPA through

comments to ensure that Colorado's permitting program is legal and effective

at reducing dangerous ozone levels.  It is especially important that the public

be given a full and fair opportunity to comment on EPA's action here, where

EPA's decision has grave consequences for the severe and long-lasting ozone

problem in Colorado.

In addition, EPA approved Colorado's permitting program despite

gaping loopholes in the program that allow the permitting agency in Colorado,

the Air Pollution Control Division ("Division"), to ignore large amounts of air

4

pollution when making permitting decisions. The permitting program as approved disregards "temporary emissions" associated with activities like construction and drilling of oil and gas wells when determining how stringent the permit for a new source of air pollution must be. The permitting program also disregards emissions from internal combustion engines on vehicles, which contribute sizeable emissions in contexts like oil and gas development. The permitting program treats these emissions as if they do not exist at a critical step of the permitting process. Meanwhile, the air pollution that results from activities like drilling for oil and gas continues to perpetuate Colorado's dangerous ozone problem.

## BASIS OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1) to review EPA's final action entitled "Air Plan Approval; Colorado; Denver Metro/North Front Range Nonattainment Area; Nonattainment NSR Permit Program Certification for the 015 8-Hour Ozone Standard." 87 Fed. Reg. 29,232 (May 13, 2022); ROA, Vol. I, at 0004. The approval that this action challenges is specific to Colorado. Thus, venue is appropriate in the Tenth Circuit. 42 U.S.C. § 7607(b)(1).

To demonstrate Article III standing, the Center must establish that at least one of its members has standing to sue in his or her own right, that the Center seeks to protect interests which are germane to its organizational purposes, and that the participation of individual members is not needed. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Individuals have standing if they suffer an injury-in-fact that is both fairly traceable to EPA's action and redressable by the Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

EPA's actions injure members of the Center in Colorado. These members suffer injury due to the ozone pollution that will not be adequately regulated under Colorado's deficient permitting program for the Denver Metro Nonattainment Area.

Scott Silber, a member of the Center, lives in Boulder, Colorado and enjoys outdoor activities such as jogging, biking, hiking, and climbing, yet he developed asthma that is aggravated by poor air quality. Silber Decl. ¶¶ 3–5 (Ex. 1). Mr. Silber often must restrict or avoid those activities altogether due to concerns about air quality. *Id.* ¶ 5. This is problematic because air quality often deteriorates during the day, and he has to plan accordingly so as not to be caught biking home in unhealthy air. *Id.* ¶¶ 9, 11. In addition to the loss of recreational and exercise opportunities, Mr. Silber regularly incurs significant

6

expenses, as he must maintain medications to treat his asthma on his person, including EpiPens. *Id.* ¶¶ 7–8. Poor air quality due to air pollution from Colorado thus injures Mr. Silber's health, recreational opportunities, and aesthetic enjoyment of Colorado's great outdoors.

Richard Reading, another member of the Center, also suffers injuries due to ozone pollution from Colorado which impacts his running, bicycling, gardening, and dog walking in Denver, Colorado. Reading Decl. ¶¶ 5–6 (Ex. 2). Dr. Reading, a wildlife biologist, suffers from serious asthma and loses his freedom to exercise outdoors when air quality is poor. *Id.* ¶ 4, 6. Dr. Reading's asthma problems lessen when he leaves the poor air quality of the Denver region, but worsen when he returns home. *Id.* ¶ 6. Unhealthy ozone levels in the Denver area impose significant costs on Dr. Reading in the form of costs for doctor and urgent care visits, medication, air filters for his home recommended by his doctor, and the use of sick and vacation time to recover from asthma attacks. *Id.* ¶ 7. Dr. Reading closely follows air quality reports and limits his activity when there are air quality alerts, and even so has occasionally had to stop running or biking due to breathing problems. *Id.* ¶ 8. Dr. Reading is well aware of the many negative impacts caused by ozone pollution such as decreased lung function, asthma, bronchitis, emphysema,

and permanent scarring of the lungs, particularly for sensitive groups, including himself.  *Id.* ¶ 11.

All these injuries are concrete, actual or imminent, and fairly traceable to EPA's actions.  EPA's failure to provide the regulatory language it was approving in the docket and its approval of a plan that disregards important sources of emissions for permitting purposes both harm the public, including the Center's members.  A favorable decision from this Court would redress these injuries by vacating this approval and remanding to EPA to provide a meaningful public comment period and to make Colorado's permitting program more effective by closing its loopholes, as discussed further below.

The Center also meets the requirements for organizational standing in this case.  Protecting its members from air pollution is directly germane to the Center's mission, Burd Decl. ¶¶ 3–7 (Ex. 3), and this case does not require the participation of any of the Center's members.

## STATEMENT OF THE ISSUES

1. Whether EPA violated the requirements of the Administrative Procedure Act and impaired the ability of the public, including the Center, to provide meaningful comment on all parts of the SIP submittal by failing to include the actual language of the Colorado

permitting program it was approving in the docket for the rulemaking.

2. Whether EPA acted contrary to law by approving Colorado's permitting program, despite the program's exclusion of "temporary emissions" and emissions from internal combustion engines on vehicles from the consideration of whether new and modified sources in the Denver Metro Nonattainment Area are major sources, when these exclusions are unauthorized and result in a Colorado permitting program that is weaker than the federal requirements allow.

## STATEMENT OF THE CASE

### I. Clean Air Act

Section 109 of the Clean Air Act requires EPA to establish primary and secondary NAAQS for a specific set of pollutants that includes ground-level ozone. 42 U.S.C. §§ 7408–7409. The primary standard must be set at the level which protects public health with "an adequate margin of safety." *Id.* § 7409(b)(1). The secondary standard must be set at the level requisite to protect public welfare, which includes effects on vegetation, crops, soils, water, wildlife, visibility, and climate. *Id*. §§ 7409(b)(2), 7602(h). The Clean

Air Act requires EPA to review the NAAQS at five-year intervals and to make revisions as needed to protect public health and welfare. *Id*. § 7409(d).

After EPA promulgates or revises a NAAQS, it must identify which areas of the country are in compliance with the NAAQS and which are not. *Id*. § 7407(d). Areas where air quality fails to meet the NAAQS are designated as "nonattainment" areas. *Id*. Ozone nonattainment areas can be classified as marginal, moderate, serious, severe, or extreme, with dates by which the areas must come into attainment with the NAAQS that range from three to twenty years after designation. 42 U.S.C. § 7511(a)(1). These classifications change over time if a nonattainment area's air quality fails to improve or worsens. *Id*.

Once EPA sets a NAAQS and designates areas as nonattainment or attainment, the Clean Air Act requires states to develop SIPs to achieve or maintain the standard. *Id*. § 7410. States are required to submit their SIPs to EPA. *Id*. EPA then reviews and is required to approve or disapprove them, depending on whether they comply with all relevant requirements of the Clean Air Act. *Id*. § 7410(k)(1)–(4).

The Clean Air Act contains specific requirements for SIPs that pertain to nonattainment areas, with additional requirements specific to ozone nonattainment areas. *Id*. §§ 7502, 7503, 7511a. Among other obligations, states are required to implement a permitting program that applies to new

10

sources of air pollution, or modifications of existing sources, within a
nonattainment area.  *Id*. §§ 7502(c)(5), 7503.  This permitting program is
commonly referred to as the "Nonattainment New Source Review" program.

Crucially, the nonattainment area permitting program only needs to
apply to "major" sources of air pollution within the nonattainment area, not
"minor" sources.  *See id*.  To determine whether a source is major or minor
before construction, a source's actual or potential emissions, which is referred
as the "potential to emit," are tallied up to determine whether those emissions
will exceed a specific emissions threshold, which takes the form of tons of
pollution emitted per year.  40 C.F.R. § 70.2.  If the source's "potential to emit"
pollution is above the emissions threshold, the source is considered major,
and it must apply for a major source permit.  *Id*.  Major sources in
nonattainment areas are subject to a variety of stringent protective measures,
like compliance with the lowest achievable emission rate and offsetting of
their pollution.  On the other hand, permits for minor sources contain "only
the barest of requirements."  *Sierra Club v. EPA*, 964 F.3d 882, 886 (10th Cir.
2020) (quoting *Luminant Generation Co. v. EPA*, 675 F.3d 917, 922 (5th Cir.
2012)).

## II. The Ozone NAAQS

In 2015, due to the serious health impacts caused by ozone pollution even when it was below the existing standards, EPA strengthened the national ozone standards.  40 C.F.R. pt. 50 (2020).  EPA revised the ozone NAAQS, reducing the allowable level from 75 parts per billion to 70 parts per billion because of extensive scientific evidence indicating ozone has a significant negative impact on public health and welfare.  80 Fed. Reg. at 65,294, 65,302–17.  The 2015 ozone NAAQS is designed to protect public health and welfare from the wide array of harms perpetrated by ozone pollution, including worsened asthma symptoms, increased hospital admissions and emergency department visits for respiratory causes, and premature mortality.  *See id.*

Unfortunately, EPA has an abysmal "track record" with regard to SIPs designed to bring the Denver Metro Nonattainment Area into attainment with the ozone NAAQS.  On July 3, 2018, EPA approved a SIP for the Denver Metro Nonattainment Area when the area was a "moderate" nonattainment area for the 2008 ozone NAAQS.  83 Fed. Reg. 31,068 (July 3, 2018).  In doing so, EPA determined that the Denver Metro Nonattainment Area would come into compliance, that is "attain," the 2008 ozone NAAQS by its moderate area attainment date.  *Id.* at 31,069.  EPA was demonstrably wrong.  Thus, on November 14, 2018, EPA published notice that the Denver Metro

12

Nonattainment Area had failed to attain the 2008 ozone NAAQS by its moderate attainment date, which "bumped up" the area to a serious nonattainment area.  83 Fed. Reg. 56,781, 56,784 (Nov. 14, 2018).

Further, EPA illegally delayed taking final action to approve or disapprove the serious nonattainment area SIP for the Denver Metro Nonattainment area for the 2008 ozone NAAQS.  Thus, the Center and others had to sue EPA for this illegal delay.  *See Center for Biological Diversity et al., v. EPA*, 22-cv-03309-RS (N.D. Cal.) Dkt. #23, First Amended Complaint, ¶ 56. That case is ongoing.  Meanwhile, on October 7, 2022, EPA published notice that the Denver Metro Nonattainment Area had failed to attain the 2008 ozone NAAQS by its serious attainment date which "bumped up" the area to a severe nonattainment area.  87 Fed. Reg. at 60,926.

Additionally, on October 7, 2022, EPA finalized its determination that the Denver Metro Nonattainment Area failed to meet the 2015 ozone NAAQS by its required attainment date.  87 Fed. Reg. 60,897.  This means that the area is "bumped up" from a "marginal" to a "moderate" nonattainment classification for the 2015 ozone NAAQS.

### III. Colorado's SIP Revisions

On July 27, 2020 Colorado submitted its SIP revisions for the Denver

Metro Nonattainment Area permitting program for the 2015 ozone NAAQS to

EPA for approval.  86 Fed. Red. 60,434 (Nov. 2, 2021); ROA, Vol. I, at 0001.  On

November 2, 2021, EPA published in the Federal Register a proposed rule

which proposed to approve Colorado's July 27, 2020 submittal.  *Id.*  Despite

the comments submitted by the Center on December 2, 2021—ROA, Vol. II, at

1560–65—EPA published its final approval of the SIP submittal in the Federal

Register on May 13, 2022.  87 Fed. Reg. at 29,232; ROA, Vol. I, at 0004.

### STANDARD OF REVIEW

The standard of judicial review of final action by EPA under the Clean

Air Act derives from the federal Administrative Procedure Act.  *Oklahoma v.*

*EPA*, 723 F.3d 1201, 1211 (10th Cir. 2013).  The standard is whether EPA's

action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).

An action is arbitrary and capricious if it has "relied on factors which

Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, [or] offered an explanation for its decision

that runs counter to the evidence before the agency . . ."  *Motor Vehicle Mfrs.*

14

*Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The

duty of a court reviewing an agency action under the arbitrary or capricious

standard is to ascertain whether the agency examined the relevant data and

articulated a rational connection between the facts found and the decision

made.  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.

1994).  The reviewing court must determine whether the agency considered

all relevant factors and whether there has been a clear error of judgment.

*State Farm*, 463 U.S. at 55.  The grounds upon which the agency acted must be

clearly disclosed in, and sustained by, the record.  *Id.* at 40.  Additionally, "[i]f

the agency has failed to provide a reasoned explanation for its action, or if

limitations in the administrative record make it impossible to conclude the

action was the product of reasoned decision making . . . it may not simply

affirm."  *Olenhouse,* 42 F.3d at 1575.

In addition, the familiar *Chevron* test for deciding statutory

interpretation has two steps.  Under step one, if a statute is not ambiguous,

"the agency must give effect to the unambiguously expressed intent of

Congress."  *Chevron U.S.A. Inc. v. Nat Res. Def. Council, Inc.*, 467 U.S. 837, 843

(1984).  However, under *Chevron* step two, EPA's interpretation of ambiguous

statutory provisions must be rejected if, among other things, "the agency has

[not] offered a reasoned explanation for why it chose that interpretation." *Vill. of Barrington v. Surface Transp. Bd.,* 636 F.3d 650, 660 (D.C. Cir. 2011).

## SUMMARY OF THE ARGUMENT

The Center respectfully requests that the Court remand this matter to EPA and require EPA to hold a new public comment period after it puts the actual language of the regulatory provisions it is proposing to approve in the docket.  This will enable the public to access the language while they are reviewing the proposed rule and drafting comments.  EPA does not dispute that it did not include the language for the permitting program in the docket for the rulemaking during the public comment period.  Instead, EPA argues that the public should have undertaken complicated and time-consuming research to identify the language on which we were supposed to be commenting during the public comment period for the proposed rule, even while acknowledging that research would not have produced all of the actual relevant regulatory language at issue.

The flaws in this approach are apparent from EPA's own response to comments.  EPA admits that one of the two online resources it would have the public consult to identify the regulatory language, an EPA webpage about Colorado's SIP, had not been updated at the time of the comment period.  In

16

other words, it was wrong.  The second resource EPA identifies, a "Clean Air Act Elements Table," provides a citation to the state regulations that make up the permitting program but does not make clear what version of those regulations Colorado submitted for EPA's approval in the action below. Neither resource contains the specific regulatory language.

This lack of transparency impairs the public's ability to provide full public comment on EPA's action and requires speculation about what regulatory language the public is commenting on.  It also has longer-term consequences.  The Clean Air Act enables members of the public to bring "citizen" lawsuits against private polluters to enforce the requirements of their permits issued under the Act.  The Clean Air Act also provides members of the public with the opportunity to comment on Title V Operating Permits. In both of these contexts, the requirements of the SIP that was in place at the time the permit was issued, or the time of the alleged violation apply, not the most recent version of the SIP.  It can be extraordinarily difficult to identify which specific SIP requirements were in place and when, inhibiting the public's ability to engage with these opportunities, which advance the goals of the Clean Air Act.  Including the regulatory language in the docket of the rulemaking that approves that language would ameliorate this difficulty.

The Court must also overturn EPA's approval of Colorado's permitting program for the Denver Metro Nonattainment Area because the program improperly disregards certain types of emissions.  The permitting program does not require these emissions to be counted towards a new or modified source's total emissions for purposes of determining whether the source is a major source because its emissions exceed the major source threshold.  One type of emissions that the permitting program improperly excludes from this consideration are "temporary emissions" associated with common activities like construction of the source or drilling of oil and gas wells.  The permitting program similarly disregards emissions from internal combustion engines on any vehicle.

These exemptions are not authorized by the EPA regulations that implement the Clean Air Act, which function as a floor that prevents states from adopting more lax requirements.  Accordingly, Colorado's permitting program allows more pollution than is authorized by the Clean Air Act and the federal regulations that should govern EPA's approval decision making process.  The federal regulations do specifically provide that two other types of emissions can be excluded when determining whether a source is major for permitting purposes.  However, the types of emissions enumerated above, such as temporary emissions, do not fall within those two narrow categories

18

that are specifically excluded.  The presence of these two specific exemptions but no others indicates that the regulations do not include any additional, implicit exclusions.

In practice, the illegal exclusion of temporary emissions and emissions from engines on vehicles from the determinations of whether a source is major or minor has grave consequences for air quality in Colorado.  The Denver Metro Nonattainment Area is home to thousands of oil and gas well pads.  These facilities are all permitted as minor sources because Colorado disregards the ozone-causing emissions that result from them before they begin producing oil and gas.  These ignored emissions come from activities like drilling, "fracking," and construction of oil and gas wells, as well as emissions from the engines used in those activities.  The consequence is that Colorado has not permitted a single well pad in Colorado as a major source, while the Denver Metro Nonattainment Area continues to exceed the 2015 and 2008 ozone NAAQS to the detriment of the millions of people who are exposed to this potentially deadly pollution.

19

# ARGUMENT

**I.     The Court must remand this matter to EPA and require EPA to hold a new public comment period after it puts the regulatory provisions it is proposing to approve in the rulemaking docket.**

When proposing to approve Colorado's permitting program for new and modified major sources in the Denver Metro Nonattainment Area, EPA held a public comment period but did not provide the public with the regulatory language that makes up the program that EPA was asking the public to comment on.  Further, as evinced by its response to the Center's comments on this issue, EPA provided the public with little to no direction as to how to identify the actual regulatory language that the public was supposed to be commenting on.  The resources EPA did expect the public to dig up during the public comment period contained erroneous and incomplete information, which EPA even acknowledges.

The notice and comment requirements of the federal Administrative Procedure Act applied to EPA's rulemaking because certain Clean Air Act-specific rulemaking requirements only apply to an enumerated set of EPA actions, which does not include SIP approvals.  42 U.S.C. § 7607(d).  At its most fundamental level, the Administrative Procedure Act requires that before an agency promulgates a rule, it must provide general notice of the rule and "give interested persons an opportunity to participate in the rule making."   5 U.S.C.

§ 553(b)–(c).  Further, "[n]otice of a proposed rule must include sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment . . ." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995).

EPA does not contest that the language of the SIP revisions it approved was not provided to the public in the docket during the public comment period.  In its response to the Center's comments in the final rule, EPA asserts that the public had access to the provisions of Colorado's permitting program that it approved through other means outside of the docket or the proposed rule.  87 Fed. Reg. at 29,233; ROA, Vol. I, at 0005.  EPA demands that the public undertake complicated and time-intensive research, using online resources that are not even hinted at in the proposed rule, to figure out what the agency is doing.

EPA immediately undercuts itself in its response to comments, noting that the first such resource that it expected the public to rely upon to identify the specific regulatory language under review, an EPA webpage, had not been updated and was not accurate during the public comment period.  *Id*.  EPA admits that the resource "had not yet been updated at the time of our proposed rulemaking to reflect the revisions to Colorado's [Nonattainment New Source Review permitting] program that were approved by EPA in 2019

21

at 84 FR 18991 (May 3, 2019)." *Id.* at 29,233, n.2; ROA, Vol. I, at 0005.  EPA

then directs the public to the Federal Register notice just quoted, *id.*, expecting

that the public would disregard the contents of EPA's webpage and identify

the error.  However, the public would need to dig even further, because that

Federal Register notice also failed to include the specific regulatory language

that EPA approved.  *See* 84 Fed. Reg. 18,991 (May 3, 2019); ROA, Vol. I, at

0722–24.

The other resource EPA mentions in its response to comments, the

Clean Air Act Elements Table, suffers from a similar defect.  87 Fed. Reg. at

29,233; ROA, Vol. I, at 0005.  This resource also is not clear enough to provide

the public with an opportunity to provide meaningful comments on the

regulatory language EPA is approving.  The table—available at ROA, Vol. I, at

0021—provides the citation to the state regulations that comprise the

permitting program, 5 CCR 1001-5, Pt. D, §§ I–VI, but, again, it does not make

clear what version of those regulations were submitted to EPA for approval,

much less actually provide the regulatory language.

Further, the table mentions a prior version of 5 CCR 1001-5, Pt. D, §

V.A.3 that was previously approved by EPA on January 25, 2016.  EPA's

proposed rule, however, makes no mention of this.  The public had no way of

knowing if EPA was approving the version of this provision that was last

approved on January 25, 2016.  Without the actual regulatory language, the public was forced to guess at the regulatory language the public was commenting on and its consequences, depriving the public of the opportunity to provide meaningful feedback on the full extent of the SIP submission.

In addition, EPA states in the proposed rule approving Colorado's permitting program that it "will generally not consider comments or comment contents located outside of the primary submission (*i.e.*, on the web, cloud, or other file sharing system)."  86 Fed. Reg. at 60,434; ROA, Vol. I, at 0001.  EPA will not even consider documents in support of comments when the commenter inserts a hyperlink with a specific URL, so all EPA has to do is click on it.  Meanwhile, in its response to comments in the final rule, EPA demands that the public undertake complicated and time-consuming research to find the contents of the regulatory language that EPA is approving.  This double standard is especially egregious because the Clean Air Act requires EPA to approve or disapprove SIPs and hold a public comment period, while members of the public who submit comments are providing a voluntary public service.

It would not have been a herculean task for EPA to have provided the public with the SIP-approved regulatory language during the public comment period.  EPA has provided the Court with this language.  ROA, Vol. II, at 0981–

1058.  The Center assumes, but it is only an assumption, that the language in ROA, Vol. II, 0981–1058 is the Colorado permitting program approved into the SIP at the time of EPA's approval.  It seems a rather modest request for the Court to order that EPA provide this regulatory language in the docket during a public comment period.

Next, EPA argues in its response to comments that it was not approving Colorado's permitting program in the action on appeal, such that it did not need to include the language of that program.  87 Fed. Reg. at 29,233; ROA, Vol. I, at 0005.  Instead, EPA's argument goes, it approved Colorado's certification that the existing permitting program Colorado already had in place met the Clean Air Act requirements that resulted from the Denver Metro Nonattainment Area's failure to meet the 2015 ozone NAAQS.  *Id*.  This is a mischaracterization of EPA's action and the requirements of the SIP approval process.

EPA's regulations provide that:

> The requirements for nonattainment NSR for the ozone NAAQS are located in § 51.165. For each nonattainment area, the state shall submit a nonattainment NSR plan or plan revision for a specific ozone NAAQS no later than 36 months after the effective date of the area's designation of nonattainment or redesignation to nonattainment for that ozone NAAQS.

40 C.F.R. § 51.1314.

EPA's position in its response to comment runs counter to the regulatory requirements—states are required to submit SIPs to EPA for approval, not certifications. EPA's approval applies to the SIP itself, which is comprised of regulatory language that was not in the docket during the public comment period.

Finally, EPA's approach of omitting the regulatory language on which it is taking action also has longer-term consequences for the ability of the public to participate meaningfully in federal and state actions that affect air pollution. EPA admits that its omission of this language is not an isolated incident but instead represents agency practice. 87 Fed. Reg. at 29,233; ROA, Vol. I, at 0005. This impairs the ability of the public to participate in at least two types of proceedings. The Clean Air Act enables members of the public to bring citizen lawsuits against private polluters to enforce the requirements of their air pollution permits. 42 U.S.C. § 7604. The Clean Air Act also provides members of the public with the opportunity to comment on Title V Operating Permits, which certain polluting facilities must obtain once they begin operating. 42 U.S.C. § 7661a(b)(6).

In both contexts, it is the requirements of the SIP that was in place at the time the permit was issued, or at the time the violation occurred, that apply,

25

not the requirements in the most recent SIP version. *See, e.g.*, *New York v. Niagara Mohawk Power Corp.*, 263 F.Supp.2d 650, 665–66 (W.D.N.Y. Apr. 28, 2003) (holding that, in a citizen suit, the plaintiff cannot enforce a state regulation in the SIP retroactively). It is extremely difficult and time-consuming, if not impossible in some cases, for members of the public to track down the specific language and regulatory requirements in the SIP that were in place when actions were taken, like major modifications at a source of air pollution. As demonstrated by EPA's response to comments and the discussion above, it is even difficult to identify the most recent version of a SIP submission at the time EPA approves it, much less a version that was in place years, even decades, earlier. However, if EPA puts the regulatory language it is proposing to approve into the docket, which is accessible via regulations.gov, this problem is eliminated.

For example, in *Sierra Club v. EPA*, this Court held that the determination of whether a source modification is major or minor is a question that is relevant whenever a Title V permit is renewed, even if that renewal takes place years later. 964 F.3d 882, 885–86 (10th Cir. 2020). In that case, the owner of the relevant source modified the source between 1997 and 1999. *Id.* at 887. The State of Utah determined that those modifications were minor modifications, rather than major, and incorporated that

26

determination into the original Title V permit in 1998. *Id.* The plaintiffs

challenged the classification of the modifications as minor in 2015, when Utah

renewed the Title V permit. *Id.* The case was not resolved by this Court until

2020. In this and similar cases, identifying the prior permitting requirements

that prevailed in older versions of the SIP to participate effectively in the

matter is extraordinarily difficult when EPA does not make the SIP

requirements it is approving available during comment periods.

  The same problem prevails in citizen enforcement cases under the Clean

Air Act. For instance, *National Parks Conservation Association v. Tennessee*

*Valley Authority* was a citizen suit in which environmental groups alleged that

a coal-burning power plant had made a major modification but failed to get a

major source permit for that modification in violation of, *inter alia*, the

Tennessee SIP. 618 F.Supp.2d 815, 819 (E.D. Tenn 2009). The *National Parks*

*Conservation Association* case was filed in 2001, 618 F.Supp.2d at 819, and

decided in 2010 based on activities which occurred at the power plant in

1988. *Nat'l Parks Conservation Ass'n v. TVA*, 2010 U.S. Dist. LEXIS 31682 (E.D.

Tenn. 2010). At the summary judgment stage, the parties submitted the

Tennessee rules, known as TAPCR, which existed during the 1988 activities as

documents in the case. *See, e.g.,* 618 F.Supp.2d at 827 (TAPCR 1200-3-9-

.01(4)(b)(4)(i) submitted as Docs 129-4, 136-6). These were the version of

27

TAPCR in effect and part of the Tennessee SIP in 1988 when the activity

alleged to be a major modification occurred.  *Id.* at 822, n.2 ("According to

Defendant, the copy of Tennessee regulations submitted as an exhibit in this

case [Doc. 129-5] are those that were 'in effect at the time of the activities at

issue in this proceeding took place in 1988.' [Doc. 129-3 at 4.] Plaintiffs have

also submitted a copy of the Tennessee regulations. [Doc. 136-7.]").


II.     **The Court must overturn EPA's approval of the Colorado's permitting program because the program ignores dangerous pollution from certain sources.**

EPA stated that it was approving Colorado's permitting program

pursuant to Clean Air Act sections 110, 172, and 173.  86 Fed. Reg. at 60,434;

ROA, Vol. I, at 0001.  40 C.F.R. § 51.1314, which requires compliance with the

requirements in 40 C.F.R. § 51.165, are the regulations which implement these

statutory provisions.  86 Fed. Reg. at 60,435; *id.* at 60,435, n.12; ROA, Vol. I, at

0002.  EPA claimed that the Colorado permitting program "fulfills the specific

minimum SIP requirements of 40 CFR 51.165" and is "in accordance with

requirements of sections 172(c)(5) and 173" of the Clean Air Act.  86 Fed. Reg.

at 60,436; ROA, Vol. I, at 0003.  EPA's claim is incorrect because Colorado's

permitting program allows more pollution than what is authorized in 40 C.F.R.

§ 51.165.

Specifically, EPA approved exemptions in the Colorado permitting program for "temporary emissions," as well as emissions from internal combustion engines sitting on, but not powering, a vehicle.  None of these exemptions are authorized in 40 C.F.R. § 51.165.  Thus, because Colorado's permitting program allows more pollution than is authorized under 40 C.F.R. § 51.165, in an area which already has potentially deadly levels of air pollution, the Court must overturn EPA's approval of Colorado's permitting program.

A.    **EPA must disapprove the Colorado permitting program because it improperly excludes "temporary emissions" from the determination of whether a source is a major source for permitting purposes.**

The version of 5 CCR 1001-5, Part D, II.A.25.f in EPA-R08-OAR-2018-0593-003 provides:

> Emissions caused by indirect air pollution sources (as defined in Section I.B.24. of Part A of this regulation), emissions from internal combustion engines on any vehicle, and emissions resulting from temporary activities, such as construction or exploration, shall be excluded in determining whether a source is a major stationary source.

*Id.* at 11; ROA, Vol. II, at 1066.  It would appear, although as explained above it is not clear, that this is part of the permitting program that EPA approved in

29

this rulemaking.  EPA, however, was required to disapprove the SIP submittal

because this is different from, and less stringent than, EPA's permitting

program rules for ozone SIPs, that is 40 C.F.R. § 51.165.

Determining whether a source is a major stationary source or only a

minor source is critical to addressing ozone pollution in the Denver Metro

Nonattainment Area.  While permitting of major sources requires numerous

stringent protective measures such as compliance with the lowest achievable

emission rate and offsetting of the pollution that will come from the major

source, minor source permitting "entails 'only the barest of requirements.'"

*Sierra Club v. US EPA*, 964 F.3d 882, 886 (10th Cir. 2020).

Specifically, 40 C.F.R. § 51.165, which is referenced by 40 C.F.R. §

51.1314, and the Clean Air Act do not allow of the exclusion of emissions

resulting from temporary activities such as construction or exploration when

determining if a source is a major source.  The definition of "potential to emit,"

which is the basis of determining if a source is a major source, does include an

exclusion for secondary emissions.  40 C.F.R. § 51.165(a)(1)(iii).  EPA's

regulations also specifically address when fugitive emissions can be excluded

in determining when a source is major for permitting purposes.  So, in

addition to the fact that the plain language of EPA's regulations does not

include an exclusion for temporary emissions, the inclusion of these two

30

exclusions in the federal regulations indicates that additional exclusions were

not intended.

>   As the Supreme Court has explained:

>   > In passing the Endangered Species Act of 1973,
>   > Congress was also aware of certain instances in which
>   > exceptions to the statute's broad sweep would be
>   > necessary. Thus, § 10, 16 U. S. C. § 1539 (1976
>   > ed.), creates a number of limited "hardship
>   > exemptions," none of which would even remotely
>   > apply to the Tellico Project. In fact, there are no
>   > exemptions in the Endangered Species Act for federal
>   > agencies, meaning that under the maxim *expressio
>   > unius est exclusio alterius*, we must presume that these
>   > were the only "hardship cases" Congress intended to
>   > exempt. Cf. *National Railroad Passenger Corp.*
>   > v. *National Assn. of Railroad Passengers*, 414 U.S. 453,
>   > 458 (1974).

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978).

>   The temporary activities exclusion makes Colorado's SIP submittal for

the permitting program less protective than EPA's regulations. Therefore,

EPA was required to disapprove the SIP submittal.

>   The illegal exclusion of "temporary emissions" from the determination

of whether a source is a major source is not a theoretical concern. The

Division has issued literally thousands of minor source permits in the ozone

nonattainment area for oil and gas well pad facilities. For every one, when

determining if the well pad facility is a major source requiring a major source

permit, the Division ignores what the Division refers to as "pre-production emissions." *See, e.g.*, ROA, Vol. II, at 1571 (the Division's facility-wide emission summary for a source being issued a minor source permit in the Denver Metro Nonattainment Area does not include "temporary emissions" from activities such as drilling, fracking, and completion). Presumably, the Division's justification for this is that the temporary activity is eligible for the exclusion in II.A.25.f, quoted above. This has resulted in the Division never issuing a major source permit for an oil and gas well pad, and the Denver Metro Nonattainment Area being a severe nonattainment area for the 2008 ozone NAAQS and also failing to attain by its marginal attainment date for the 2015 ozone NAAQS.

In its response to comments, EPA argued for the first time that the exclusion of temporary emissions in the Colorado permitting program is allowable because "secondary emissions" are excluded from the definition of potential to emit, and the potential to emit pollution is used to determine if a source is a major source. 87 Fed. Reg. at 29,234; ROA, Vol. I, at 0006. EPA goes on to correctly point out that the definition of secondary emissions includes "emissions which would occur because of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself." *Id.* EPA uses

32

this definition to justify approving Colorado's approach of disregarding temporary emissions. *Id.*

But the definition of secondary emissions does not include the word "temporary" or any other word indicating a timing consideration. In fact, the first sentence of the definition of secondary emissions makes clear that some construction emissions are not secondary emissions even though common sense informs us that construction is normally a temporary activity. The first sentence says: "**Secondary emissions** means emissions which would occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself." 40 C.F.R. § 51.165(a)(1)(viii) (emphasis added). Thus, the plain language of the definition of secondary emissions establishes that emissions that occur as a result of construction, but that do come from the major stationary source itself, are not secondary emissions.

Specific examples may help to clarify. If one is building a factory and an offsite cement processing plant is set up to create cement to build the factory, emissions from the offsite cement processing plant would be secondary emissions and thus not counted in calculating the potential to emit of the factory when determining whether the factory is a major source. This is so because the emissions from the offsite cement processing plant are emissions

33

that occur as a result of the construction of the major stationary source, that is the factory, but do not come from the major stationary source, which is, again, the factory.

However, a core problem in Colorado leading to the Denver Metro Nonattainment Area having one of the worst ozone problems in the country, and one example of why EPA's reliance on the definition of secondary source fails, is that the Colorado permitting program excludes emissions from construction of oil and gas well pads as temporary emissions. But these emissions do not fall under the definition of secondary emissions. For example, typically oil and gas is extracted in Colorado with a process called hydraulic fracturing, which is often referred to as just "fracking." Fracking involves drilling a well and then forcing a combination of liquids and sand down the well to fracture geologic formations underground, which creates a passage for the oil and gas to flow back up to the well. The oil and gas includes volatile organic compounds, which cause ozone pollution. In this situation, the volatile organic compounds come from the well, which is the source itself, not an offsite support facility or anything else. Thus, because these emissions, even if they are temporary, come from the major stationary source itself, that is the well, the emissions do not qualify as secondary

34

emissions based on the plain language of the definition of secondary emissions.  Therefore, EPA's justification in its response to comments fails.

EPA goes on to say in its response to comments that "[Nonattainment New Source Review] permitting concerns continuous operating emissions of a stationary source and not temporary emissions, or emissions associated with construction."  87 Fed. Reg. at 29,234; ROA, Vol. I, at 0006.  EPA provides no citation for this assertion because there is none.  Rather, EPA is trying to create a nonexistent exception out of whole cloth.  *See generally Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) (Clean Air Act governs construction of a pollutant source).  As explained above, the very definition of secondary emissions provides that the emissions that occur as a result of construction that come from the major stationary source itself, such as an oil and gas well, are not secondary emissions and thus are not excluded from the potential to emit used to determine if a source is a major source.  *See* 40 C.F.R. § 51.165(a)(1)(viii).

Further, regulatory evidence that the permitting program must cover emissions during the construction of a major source can be found in EPA's regulations when EPA, rather than a state, is the permitting authority.  These regulations are found, in part, in 40 C.F.R. Part 51, Appendix S.  Section IV.B of Appendix S includes an exemption which allows "emissions resulting from the

35

construction phase of a new source" to avoid the applicability of two, but only two, conditions of the five conditions which must be met in order for a major source to get a permit. Thus, if emissions from the construction phase are exempt from two conditions but not exempt from the other three conditions, the permitting program that EPA referred to as Nonattainment New Source Review in its response to comments must cover emissions from the construction phase of a major source.

EPA itself makes it perfectly clear that its statement in the response to comments—that the permitting program does not concern emissions from the construction phase—is incorrect by including an air permit EPA itself issued for an offshore windfarm (although EPA Region 1 issued the permit, rather than EPA Region 8, who wrote the response to comments). ROA, Vol. I, at 0764. It would seem obvious that windfarms themselves do not emit air pollution during continuing operations. Thus, EPA issued that permit to address emissions during the construction phase and emissions of engines on vehicles, that is boats serving the offshore windfarm.

Beyond the clear plain language of the regulations and the example of EPA issuing a permit, EPA's approval of allowing unfettered emissions which are temporary, such as emissions during the construction and fracking of oil and gas wells, undercuts the very purpose of the Clean Air Act. The core of the

36

Clean Air Act is that EPA sets NAAQS, which are the maximum allowable levels

of certain pollutants in the public's air. "The Act then shifts the burden to

States to propose plans adequate for compliance with the NAAQS." *EPA v.*

*EME Homer City Generation L.P.*, 134 S. Ct. 1584, 1594 (2014). By ignoring

pollution during the construction of sources and other temporary emissions,

Colorado's proposed plan is inadequate for compliance with the NAAQS. This

is especially problematic for many of the NAAQS which are based on short

averaging times. For example, for both of the pollutants nitrogen dioxide and

sulfur dioxide, the NAAQS is based on a one-hour averaging time. EPA chose

to use a one-hour averaging time because the science clearly showed that

short-term exposures to these pollutants, even for as little as five-minutes, can

cause adverse health impacts. *See e.g.* 75 Fed. Reg. 35,520, 35,524 (June 22,

2010). By allowing unpermitted emissions during construction and other

"temporary" activities which can last days, weeks, or months, Colorado's SIP is

not adequate for compliance with the NAAQS and people's health and very

lives are jeopardized.

**B.    EPA must disapprove the Colorado permitting program because it improperly excludes emissions from internal combustion engines on a vehicle from the determination of whether a source is a major source for permitting purposes.**

Similarly, the Clean Air Act and 40 C.F.R. § 51.165 do not include an exclusion for emissions from internal combustion engines on any vehicle. Note the key word here is "on" a vehicle.  With the use of the word "on," this provision can be used to ignore emissions from internal combustion engines used for fracking, completion, and other activities, so long as the engine is sitting on a vehicle such as a flat-bed truck.  To be clear, the Center is not challenging the exclusion of emissions from an engine whose purpose is to propel a vehicle.

Again, in practice, the Division does indeed ignore emissions from engines used in fracking, competition, and other activities in determining if a source must get a major source permit.  Presumably, this is based on this additional exclusion that Colorado created but which does not exist in EPA's regulations.  Thus, the Court must reverse EPA's action in approving exemptions in the Colorado permitting program that are not authorized by the governing regulations or the statute.

5 CCR 1001-5, Part D, II.A.23.f also appears to create the same exclusions for temporary construction or exploration activities and internal

combustion engines on any vehicle, but applied to the context of determining

if a modification of a major source is a major modification or a minor

modification.  This section provides:

> Emissions caused by indirect sources of pollution, emissions from internal combustion engines on any vehicle, and emissions resulting from temporary construction or exploration activities shall be excluded in determining whether a major modification will occur.

ROA, Vol. II, at 1062.

For the same reasons as discussed above, the Court must overturn EPA's

approval of this unauthorized exemption into Colorado's permitting program.

With regard to the exemption for "engines on any vehicle," in 5 CCR

1001-5, Part D, II.A.25.f, EPA's response to comment misses the mark because

EPA's response is based on a specifically defined term which does not actually

appear in Part D, II.A.25.f.  EPA stated:

> The exclusion of emissions from internal combustion engines on any vehicle at Section II.A.25.f of Regulation 3, Part D is appropriate since mobile source emissions from **nonroad mobile** and on-road mobile sources are not considered as part of the operating emissions of a stationary source.

87 Fed. Reg. at 29,234 (emphasis added); ROA, Vol. I, at 0006.  EPA goes on to

discuss the definition of "nonroad engine" which is found in 40 C.F.R. §

1068.30 and Colorado's 5 CCR 1001-5, Part A, 1.B.31.b.(iii) .  But the term

39

"nonroad engine," with its specifically defined meaning, does not appear in Colorado Regulation No. 3, Part D, II.A.25.f.  Rather, that regulation uses the phrase "internal combustion engines on any vehicle."  EPA could certainly have suggested to Colorado that Colorado rewrite Part D, II.A.25.f. to use the term "nonroad engine." But Part D, II.A.25.f. does not use that term, and EPA cannot pretend otherwise.

## CONCLUSION

The Court should remand this matter back to EPA so that EPA can hold a new public comment period, during which EPA gives the public access, via the rulemaking docket, to the actual language of Colorado's permitting program that EPA is proposing to approve.  The Court should also vacate the final rule, but only with respect to EPA's approval of the unauthorized exclusion of temporary emissions and emissions from engines on vehicles from the consideration of whether a source is major or has had a major modification.

## ORAL ARGUMENT STATEMENT

The Center believes that oral argument would be useful in this case because it presents two issues of first impression, and it is relatively rare that Clean Air Act cases are litigated in this Court.

40

Dated: November 3, 2022

Respectfully submitted,

Ryan Maher
Center for Biological Diversity
1411 K St., Ste. 1300
Washington, DC 20002
781-325-6303
rmaher@biologicaldiversity.org

Robert Ukeiley
Center for Biological Diversity
1536 Wynkoop St., Ste. 421
Denver, Colorado 80202
720-496-8568
rukeiley@biologicaldiversity.org

*Attorneys for Petitioner Center for Biological Diversity*

**CERTIFICATE OF SERVICE**

I certify that on November 3, 2022, I electronically filed this *CORRECTED*

PETITIONER'S OPENING BRIEF with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to all Counsel of Record.

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

  (1)    All required privacy redactions have been made per 10th
         Cir. R. 25.5;

  (2)    If required to file additional hard copies, that the ECF
         submission is an exact copy of those documents;

  (3)    The digital submissions have been scanned for viruses with
         the most recent version of a commercial virus scanning
         program, Windows Defender, and according to the program
         are free of viruses.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limitation and word limit of Fed. R. App. P. 32(g) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,877 words. Furthermore, this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using the 2016 version of Microsoft Word in 14-point Cambria font.

Dated: November 3, 2022

Ryan Maher
Center for Biological Diversity
1411 K St., Ste. 1300
Washington, DC 20002
781-325-6303
rmaher@biologicaldiversity.org

*Attorney for Petitioner Center for Biological Diversity*

(e) * * *

| Title | State effective date | EPA effective date | Final rule citation/date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Denver Metropolitan Area** | | | | |
| Reasonably Available Control Technology for the 2008 8-Hour Ozone National Ambient Air Quality Standard (NAAQS) State Implementation Plan (RACT SIP). | 11/21/2017 | 6/13/2022 | [insert **Federal Register** citation], 5/13/2022. | Previous SIP approvals 7/03/2018, 2/24/202, and 11/05/2021. Conditional approval of oil and gas RACT 5/13/2022. |
| * | * | * | * | * |

[FR Doc. 2022–10212 Filed 5–12–22; 8:45 am]

BILLING CODE 6560–50–P

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 52

[EPA–R08–OAR–2020–0644; FRL–9164–02–R8]

### Air Plan Approval; Colorado; Denver Metro/North Front Range Nonattainment Area; Nonattainment NSR Permit Program Certification for the 2015 8-Hour Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is approving a state implementation plan (SIP) revision submitted by the State of Colorado. The submittal certifies that the State of Colorado has fulfilled, through previous SIP revisions, Nonattainment New Source Review (NNSR) Permit Program requirements under the 2015 8-hour ozone National Ambient Air Quality Standards (NAAQS) for the Denver Metro/North Front Range (DMNFR) area. The State of Colorado submitted the certification to meet the nonattainment requirements for Marginal ozone nonattainment areas (NAAs) for the 2015 8-hour ozone NAAQS. The EPA is taking this action pursuant to sections 110, 172, 173, and 182 of the Clean Air Act (CAA).

**DATES:** This rule is effective on June 13, 2022.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R08–OAR–2020–0644. All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some

information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *http:// www.regulations.gov,* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional availability information.

**FOR FURTHER INFORMATION CONTACT:** Matthew Lang, Air and Radiation Division, EPA, Region 8, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado 80202–1129, telephone number: (303) 312–6709, email address: *lang.matthew@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document ''we,'' ''us,'' and ''our'' means the EPA.

## I. Background

The background for this action is discussed in detail in our November 2, 2021 proposal.[1] In that document we proposed to approve a NNSR permit program certification for the DMNFR Marginal NAA because the certified NNSR permit program was prepared in accordance with requirements of sections 172(c)(5) and 173 of the CAA and fulfills the specific minimum SIP requirements of 40 CFR 51.165. The EPA is finalizing its proposed approval of the NNSR certification submitted by the State of Colorado for the DMNFR Marginal NAA under the 2015 8-hour ozone NAAQS. With this final rulemaking Colorado will have met the NNSR permit program requirement

stemming from the Marginal nonattainment designation of the DMNFR area.

EPA held a 30-day comment period on the proposed rulemaking beginning on November 1, 2021 and closing on December 2, 2021. We received comments on the proposal from two commenters. One individual expressed support for our proposed rulemaking. We also received comments from the Center for Biological Diversity (CBD) claiming that EPA must hold a new comment period and that Colorado's SIP is inadequate with respect to NNSR permit program requirements. We thank the commenters and our responses to the comments received are included below.

## II. Response to Comments

*Commenter 1*

One commenter expressed support of the proposed approval and provided a general suggestion that sources be given time to make any needed changes to practices.

*Response:* With respect to the commenter's concern that sources be given time to make changes to practices, we note that this rulemaking does not impose any additional regulatory requirements on sources that would take time to implement. NNSR is a preconstruction review program that only applies to new sources and major modifications at existing sources. This action solely approves the certification submitted by the State of Colorado explaining that the existing federally-approved NNSR permit program meets the requirements of 172(c)(5) and 173 of the CAA and fulfills the specific minimum SIP requirements of 40 CFR 51.165 for NNSR permit programs for the 2015 8-hour ozone NAAQS.

---

[1] Approval and Promulgation of Implementation Plans; Colorado; Denver Metro/North Front Range Nonattainment Area; Nonattainment NSR Permit Program Certification for the 2015 8-Hour Ozone Standard, 86 FR 60434 (November 2, 2021).

*Comments From the Center for Biological Diversity*

Comment 1

CBD asserts that EPA must hold a new comment period since EPA did not include the regulatory provisions that it is proposing to approve in the docket.

*Response:* In this rulemaking, EPA proposed to approve a NNSR permit program certification that was submitted by Colorado and which certified that the State's existing SIP-approved NNSR permit program meets the marginal nonattainment requirement for implementation of a NNSR permit program. As such, our action does not approve any actual revisions to the text of the Colorado SIP, as was stated in our proposed rulemaking. The provisions which have been approved by EPA into the Colorado SIP via past rulemaking actions are publicly available, and were publicly available at the time of our proposed rulemaking, on EPA's web page showing approved statutes and regulations in the Colorado SIP.[2] Links to the EPA actions that have most recently approved revisions to each section of the Colorado SIP are available at this EPA web page and can also be found at 40 CFR part 52, subpart G.[3]

Furthermore, the provisions of Colorado's SIP that the state certified as meeting the requirements for NNSR programs for new major sources and major modifications at existing sources in ozone nonattainment areas are specifically listed in the "Clean Air Act Elements Table" provided at attachment 7 of Colorado's SIP submittal. Attachment 7 of the submittal was referenced in the proposed rulemaking as being the NNSR provisions that Colorado is certifying. See 86 FR 60435. According to that attachment, the relevant SIP provisions for the NNSR permit program are found in sections I, II, and V of Regulation 3, Part D of the Colorado Code of Regulations (CCR). Instead of approving new revisions to the text of the existing SIP, this action approves those existing regulations which have already been incorporated into the SIP as meeting NNSR permit program requirements for ozone NAAs under the 2015 8-hour ozone NAAQS.

Since no revisions to the Colorado SIP were submitted by the State and because, as mentioned previously, the existing SIP is available to the public and specific sections of the submittal highlighted the relevant provisions in the SIP, it is not necessary to include a copy of the SIP-approved NNSR permit program in the docket of the proposed rulemaking. Furthermore, it is not necessary to include a copy of the SIP-approved NNSR permit program in the docket since the opportunity for public comment was previously provided on each occasion that revisions to the NNSR permit program were approved into the SIP. This is consistent with other actions taken by EPA in approving certification SIP submittals to meet the 2008 and 2015 Marginal area SIP revision requirement for NNSR permit programs in which the State submittals and EPA approvals make reference to the relevant State regulations that are already federally approved while noting the most recent approval of revisions to the NNSR provisions.[4]

Comment 2

CBD asserts that EPA must disapprove Colorado's NNSR permit program certification because the NNSR program does not address the designation of northern Weld County as nonattainment given that this designation is effective beginning on December 30, 2021.

*Response:* This comment concerns the applicability of Colorado's NNSR permit program to the portion of Weld County that was newly designated as nonattainment as part of the DMNFR NAA, effective on December 30, 2021. Colorado's SIP-approved NNSR program applies generally to all ozone NAAs within the State of Colorado.[5] Thus, upon the effective date of designation of northern Weld County as nonattainment through inclusion in the DMNFR NAA, the existing NNSR permit program applies by operation of law to new major sources and major modifications in the portion of northern Weld County that has been newly designated as nonattainment. Since the 2015 nonattainment boundary was remanded without vacatur, the NAA boundary that did not include northern Weld County was effective at the time of publication of our proposed rule. Therefore, our

proposed rule noted that to the extent that EPA's designation changes on remand, Colorado will be required to address the change as part of a future SIP revision. Upon further review, EPA acknowledges that the footnote in EPA's proposal that commenters reference (footnote 6 at 86 FR 60435) could be clearer.[6] That footnote was not intended to speak directly to the NNSR permit program requirement, but rather was intended to make a general point that additional supplements or revisions could be needed to fulfill Marginal area SIP revision requirements should a change in the NAA boundary be made final. This footnote is consistent with the language used in EPA's final action regarding designations for remanded areas at 86 FR 67869.[7] Since EPA interprets Colorado's NNSR permit program as being generally applicable to any ozone NAA within the State, it became applicable to the newly-designated portion of Weld County on the effective date of this designation (Dec. 30, 2021). There is no need for additional revisions to the existing NNSR permit program to make it applicable to the area of northern Weld County designated as nonattainment in 2021.[8]

Comment 3

CBD asserts that EPA must disapprove Colorado's certification of the state's NNSR permit program because the program does not ensure that minor sources in the DMNFR NAA will not cause or contribute to increment violations.

*Response:* The NNSR permit program requirements that are the focus of this action are specific to new major sources and modifications at existing sources in

---

[2] See *https://www.epa.gov/sips-co/epa-approved-statutes-and-regulations-colorado-sip*. We note that this compilation of EPA-approved statutes and regulations had not yet been updated at the time of our proposed rulemaking to reflect the revisions to Colorado's NNSR program that were approved by EPA in 2019 at 84 FR 18991 (May 3, 2019). However, that action (84 FR 18991) was specifically referenced in our notice of proposed rulemaking as being the most recent approval of revisions to Colorado's SIP-approved NNSR permit program.

[3] See *https://www.ecfr.gov/current/title-40/chapter-I/subchapter-C/part-52/subpart-G*.

[4] Air Plan Approval; Texas; Clean Air Act Requirements for Nonattainment New Source Review and Emission Statements for the 2015 Ozone National Ambient Air Quality Standards, 86 FR 50456 (September 9, 2021). Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Nonattainment New Source Review Requirements for 2008 8-Hour Ozone Standard, 84 FR 5598 (February 22, 2019).

[5] 5 CCR 1001–5:3D.II.A.25.b; 5 CCR 1001–5:3D.V.A.3.

[6] Footnote 6 at 86 FR 60435 of EPA's proposal is copied here for reader convenience: The EPA excluded part of Weld County from the DMNFR NAA, but that designation was remanded without vacatur in *Clean Wisconsin* v. *EPA*, 964 F.3d 1145, 1167–69, 1177 (D.C. Cir. 2020). To the extent the EPA's designation with respect to Weld County changes on remand, CO will be required to address the change in a future SIP revision.

[7] Additional Revised Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards: El Paso County, Texas and Weld County, Colorado, 86 FR 67864 (November 30, 2021).

[8] EPA acknowledges that 2021 revised designations action amending the boundary line for Denver Metro/North Front Range NAA to include the northern portion of Weld County has been challenged in court. *Board of County Commissioners of Weld County, CO* v. *EPA*, No. 21–1263 (D.C. Cir., Dec. 15, 2021). On March 15, 2021, the court denied Petitioners' request to stay the Agency's revised designations action. If the court eventually takes an action that results in northern Weld county's exclusion from the Denver Metro/North Front Range NAA, then Colorado's existing NNSR permit program would no longer apply there until such time northern Weld County is again part of an ozone nonattainment area.

ozone NAAs and include the requirements that were promulgated in the "Phase 2 Rule" implementing the 1997 8-hour ozone NAAQS and which are listed in our proposed rulemaking.[9] Therefore, since none of the requirements for NNSR major source permit programs at 40 CFR 51.165 concern contributions to consumption of PSD increment, this comment falls outside the scope of this proposed rulemaking. Furthermore, we again note for clarity that the EPA is not approving any revision to the Colorado SIP. Instead, EPA is approving Colorado's certification that the existing SIP-approved NNSR permit program continues to meet the minimum requirements for NNSR permit programs in Marginal ozone NAAs under the 2015 8-hour ozone NAAQS. Colorado's SIP certification did not, and need not, address the PSD or minor source permitting requirements under 40 CFR 51.166 or 51.160. Further, there is no PSD increment for ozone in section 51.166(c).

Comment 4

CBD asserts that EPA must disapprove Colorado's certification of their NNSR permit program because the program provides for exclusions of temporary emissions and emissions from internal combustion engines on vehicles from being used in the determination of whether a source is a major stationary source subject to NNSR permitting. CBD claims these exclusions are not allowed by the CAA.

*Response:* As referenced by the commenter, the definition of potential to emit at 40 CFR 51.165(a)(1)(iii) excludes secondary emissions in determining the potential to emit of a stationary source. Secondary emissions are defined at 40 CFR 51.165(a)(1)(viii) to include emissions which would occur because of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. NNSR permitting concerns continuous operating emissions of a stationary source and not temporary emissions or emissions associated with construction. Therefore, the exclusion of emissions from temporary activities contained at Section II.A.25.f of Regulation 3, Part D in the CCR is allowable per the

definition of secondary emissions and exclusion of secondary emissions under the definition of potential to emit at 40 CFR 51.165. The exclusion of emissions from internal combustion engines on any vehicle at Section II.A.25.f of Regulation 3, Part D is appropriate since mobile source emissions from nonroad mobile and on-road mobile sources are not considered as part of the operating emissions of a stationary source. However, under the definition of "Nonroad engine" at 40 CFR 1068.30 an internal combustion engine is not a nonroad engine if it remains or will remain at a location for more than 12 consecutive months and would instead become a stationary engine as specified by 40 CFR 1068.31(e)(1). This definition is reflected in Section I.B.31.b.(iii) of Regulation 3, Part A of the CCR which is incorporated into the SIP.[10] Mobile source emissions are regulated by Title II of the CAA which includes emissions standards for moving sources and therefore mobile source emissions are not included in the determination of whether a stationary source is a major source for NNSR purposes. Section II.G of Appendix S to 40 CFR part 51, which set forth EPA's interpretive ruling on preconstruction review, details that "since EPA's authority to perform or require indirect source review relating to mobile sources regulated under Title II of the Act (motor vehicles and aircraft) has been restricted by statute, consideration of the indirect impacts of motor vehicles and aircraft is not required under this Ruling." We therefore disagree with the assertion by the commenter that the exclusion of temporary emissions and emissions from internal combustion engines on vehicles are not allowable in the determination of whether a source is major with respect to NNSR permitting.

Comment 5

CBD asserts EPA must disapprove Colorado's certification of their NNSR permit program because the program provides for exemptions relating to offset requirements not allowed under the CAA or EPA's regulations. Specifically, the commenter claims that the following exemptions from offset requirements that are located in Regulation 3, Part D are not allowed: Portable sources that will relocate outside a NAA in less than one year, pilot plants that operate an aggregate of less than six months, construction phases of a new or modified building/facility/structure/installation, temporary processes or activities of less than one

year in duration, and sources undergoing fuel switches.[11]

*Response:* Appendix S to 40 CFR part 51 is a codification of EPA's Emissions Offset Interpretive Ruling on the preconstruction review requirements for stationary sources under 40 CFR part 51, subpart I. Section IV.B of Appendix S contains exemptions consistent with those that the commenter objects to. These exemptions include temporary emission sources such as portable facilities that will be relocated outside of the NAA after a short period of time, pilot plants, and emissions resulting from the construction phase of a new source. We highlight that this Appendix S provision concerning offset exemptions for temporary emissions from construction phases does not prohibit reviewing authorities from concluding that emissions associated with construction phases exceeding a period of one year are temporary emissions. The language of section IV.B of Appendix S is general enough to allow the reviewing authority to exempt emissions resulting from a construction phase exceeding one year from offset requirements. Section IV.B of Appendix S also includes an exemption for sources which must switch fuels due to lack of adequate fuel supplies or where a source is required to be modified as a result of EPA regulations. This exemption applies only if an applicant has demonstrated that it has made its best efforts to obtain sufficient emission offsets and that efforts were unsuccessful, the applicant has secured all available emission offsets, and the applicant will continue to seek the necessary emission offsets and apply them when they become available. Appendix S currently serves as a NNSR permitting program that may be applied by states that do not have an approved NNSR program in their SIP or lack a particular element of such a program. The omission of the Appendix S offset exemptions at 40 CFR 51.165 does not preclude the inclusion of the same exemptions in the Colorado SIP. The Emissions Offset Interpretive Ruling reflects a longstanding EPA interpretation of the CAA. EPA does not consider it appropriate to allow states without an approved NNSR program to apply the exemptions in Appendix S, while denying states who have taken on the task of developing an NNSR program for EPA approval the same opportunity to implement exemptions that EPA has previously-determined to be permissible under the Act. The exemption from offset requirements at Section IV.B of Appendix S to 40 CFR

---

[9] Final Rule to Implement the 8-Hour Ozone National Ambient Air Quality Standard-Phase2; Final Rule to Implement Certain Aspects of the 1990 Amendments Relating to New Source Review and Prevention of Significant Deterioration as They Apply in Carbon Monoxide, Particulate Matter and Ozone NAAQS; Final Rule for Reformulated Gasoline, 70 FR 71612 (November 29, 2005).

[10] 5 CCR 1001–5:3A.I.B.31.b.(iii).

[11] 5 CCR 1001–5:3D.V.A.8.a(i)(A)–(E)

part 51 specifically for emissions resulting from the construction phase of a new source was most recently recognized as an appropriate exemption in a permit issued by EPA for the South Fork Windfarm on the Outer Continental Shelf (OCS).[12] Therefore, we disagree with the claim made by the commenter that the exemptions at section V.A.8 of Regulation 3, Part D are not allowed under the CAA or EPA's regulations since, as detailed previously, these exemptions are in section IV.B of Appendix S to 40 CFR part 51.

## III. Final Action

The EPA is finalizing approval of the NNSR permit program certification submitted by the State of Colorado because the certified NNSR Permit Program was prepared in accordance with requirements of sections 172(c)(5) and 173 of the CAA and fulfills the specific minimum SIP requirements of 40 CFR 51.165.

## IV. Statutory and Executive Order Reviews

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

• Is not a "significant regulatory action" subject to review by the Office of Management and Budget under Executive Orders 12866 (58 FR 51735, October 4, 1993) and 13563 (76 FR 3821, January 21, 2011);

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 et seq.);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 et seq.);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and

• Does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction. In those areas of Indian country, the rule does not have tribal implications and will not impose substantial direct costs on tribal governments or preempt tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

The Congressional Review Act, 5 U.S.C. 801 et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United

States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by July 12, 2022. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (see section 307(b)(2)).

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Carbon monoxide, Greenhouse gases, Incorporation by reference, Intergovernmental relations, Lead, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides, Volatile organic compounds.

Dated: May 8, 2022.

**KC Becker,**

*Regional Administrator, Region 8.*

40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 et seq.

## Subpart G—Colorado

■ 2. In § 52.320, the table in paragraph (e) is amended by revising the center heading "Maintenance Plans" and adding the entry "Ozone (8-hour, 2015) DMNFR NNSR Certification" at the end of the "Denver Metropolitan Area" subheading to read as follows:

**§ 52.320   Identification of plan.**

*    *    *    *    *

(e) *    *    *

---

[12] See EPA Response to Comments for South Fork Windfarm OCS Air Permit at p. 14. Available online at *https://www.epa.gov/system/files/documents/2022-01/sfw-response-comments-final-permit-ocs-r1-04.pdf.*

| Title | | State effective date | EPA effective date | Final rule citation/date | | Comments |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| **Maintenance and Attainment Plan Elements** | | | | | | |
| * | * | * | * | * | * | * |
| **Denver Metropolitan Area** | | | | | | |
| Ozone (8-hour, 2015) Certification. | DMNFR NNSR | 7/6/2020 | 6/13/2022 | May 13, 2022, [insert **Federal Register** citation]. | * | * |
| * | * | * | * | * | * | * |

[FR Doc. 2022–10211 Filed 5–12–22; 8:45 am]

BILLING CODE 6560–50–P

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 622

[Docket No. 200124–0029; RTID 0648–XB978]

### Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; 2022 Red Snapper Private Angling Component Accountability Measure in Federal Waters Off Louisiana and Florida

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule, accountability measure.

**SUMMARY:** Through this temporary rule, NMFS implements accountability measures (AMs) for the red snapper recreational sector private angling component in the Gulf of Mexico (Gulf) off Louisiana and Florida for the 2022 fishing year. Based on information provided by the Louisiana Department of Wildlife and Fisheries (LDFW) and Florida Fish and Wildlife Conservation Commission (FWC), NMFS has determined that the 2021 regional management area private angling component annual catch limits (ACL) for Gulf red snapper were exceeded for both Louisiana and Florida. Therefore, NMFS reduces the 2022 private angling component ACLs of Gulf red snapper for both the Louisiana and Florida regional management areas. This reduction will remain in effect through the remainder of the current fishing year on December

31, 2022, and is necessary to protect the Gulf red snapper resource.

**DATES:** This temporary rule is effective from 12:01 a.m., local time, on May 13, 2022, until 12:01 a.m., local time, on January 1, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kelli O'Donnell, NMFS Southeast Regional Office, telephone: 727–824–5305, email: kelli.odonnell@noaa.gov.

**SUPPLEMENTARY INFORMATION:** The Gulf reef fish fishery, which includes red snapper, is managed under the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (FMP). The FMP was prepared by the Gulf of Mexico Fishery Management Council and is implemented by NMFS under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) through regulations at 50 CFR part 622. All red snapper weights discussed in this temporary rule are in round weight.

In 2015, Amendment 40 to the FMP established two components within the recreational sector fishing for red snapper: The private angling component, and the Federal charter vessel and headboat (for-hire) component (80 FR 22422, April 22, 2015). In 2020, NMFS implemented Amendments 50 A–F to the FMP, which delegated authority to the Gulf states (Louisiana, Mississippi, Alabama, Florida, and Texas) to establish specific management measures for the harvest of red snapper in Federal waters of the Gulf by the private angling component of the recreational sector (85 FR 6819, February 6, 2020). These amendments allocate a portion of the private angling ACL to each state, and each state is required to constrain landings to its allocation as part of state management.

As described at 50 CFR 622.39(a)(2)(i), the Gulf red snapper recreational sector quota (ACL) is 7.399 million lb (3.356 million kg) and the recreational private

angling component quota (ACL) is 4.269 million lb (1.936 million kg). The Louisiana regional management area private angling component ACL is 816,233 lb (370,237 kg) (50 CFR 622.23(a)(1)(ii)(C)) and the Florida regional management area private angling component ACL is 1,913,451 lb (867,927 kg) (50 CFR 622.23(a)(1)(ii)(B)). Regulations at 50 CFR 622.23(b) require that if a state's red snapper private angling component landings exceed the applicable state's component ACL, then in the following fishing year, that state's private angling ACL will be reduced by the amount of that ACL overage in the prior fishing year.

Based on data provided by the LDFW, NMFS has determined that landings of red snapper off Louisiana for the private angling component, which includes landings for state charter vessels, in 2021 were 823,151 lb (373,375 kg); which is 6,918 lb (3,138 kg) greater than 2021 Louisiana allocation of the private angling component ACL. Based on data provided by the FWC, NMFS has determined that landings of red snapper off Florida for the private angling component, which includes landings for state charter vessels, in 2021 were 2,169,739 lb (984,177 kg); which is 256,288 lb (116,250 kg) greater than 2021 Florida allocation of the private angling component ACL. Accordingly, for the 2022 fishing year, this temporary rule reduces the Louisiana regional management area private angling component ACL for Gulf red snapper by the ACL overage amount of 6,918 lb (3,138 kg), which results in a revised 2022 private angling ACL for Louisiana of 809,315 lb (367,099 kg). This temporary rule also reduces the Florida regional management area private angling component ACL for Gulf red snapper by the ACL overage amount of 256,288 lb (116,250 kg), which results in

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

No. 22-9546
_____

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner – Appellant*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY *et al.*,
*Respondent – Appellees*

_____

On Petition for Review of Final Action of the U.S. Environmental Protection
Agency

_____

**ATTACHMENT 2: DECLARATION OF SCOTT SILBER**

_____

I, Scott Silber, declare that the following statements are true and correct
to the best of my knowledge, information, and belief, and are based on my
personal experiences and my review of publicly available information:

1.    I am over 18 years of age.

2.    I am a member of the Center for Biological Diversity ("Center") and

support the Center's efforts to reduce the threats from air pollution.

3.    I live in Boulder, Boulder County, Colorado. I have lived in the Boulder

area, on and off, for the past 24 years. I intend to continue living in

Boulder.

1

4.    I enjoy outdoor activities, including jogging roughly 50-60 miles in 2-3 weeks, biking, hiking, playing ultimate Frisbee on a team, and climbing, and I will continue to do so except for the limitations I discuss below. I regularly run near my household in Boulder and try to run at least three times per week.

5.    I am often unable to go outdoors to exercise because of poor air quality because my asthma is triggered. Bad air quality is an irritant that affects my overall health in addition to asthma because it makes me feel lethargic and generally bad.

6.    Due to poor air quality, I bought a pass to a recreation center where I swim indoors, where the air quality is better. Consequently, I do not suffer from asthma attacks as I would if I were exercising outdoors when air quality is poor. I would prefer not to spend additional money on a pass for the recreation center. I do not want to exercise indoors because I prefer natural light to the artificial light indoors and would rather be running outdoors for my spiritual and aesthetic enjoyment.

7.    Due to poor air quality, I use medications to treat my asthma including a rescue inhaler and a preventive inhaler, and I carry medications such as an epinephrine auto injector and prednisone for emergency situations. All my asthma medications can cause negative side effects including

light headedness, agitation, thrush, increased heart rate, and palpitations. These side effects can interrupt my normal activities. For example, I have had to take a break from whatever I was doing to let the side effects subside.

8.   The medications are also expensive. While my asthma medication is currently covered by my health insurance, I have had to pay for them out of pocket in the past if they are not covered by my health insurance, and the copay varies, as well. Asthma medications also must be replaced with new medications after their expiration date. I am concerned that I may have to pay for my medication out of pocket in the future. This is frustrating for me because I would rather not have to spend money on medications needed because of poor air quality.

9.   To plan my activities and to try to avoid triggering my asthma, I use an application on my phone to help me know the status of air quality. I often do not engage in activities where I exert myself when the air quality is poor because it is not worth it to feel the discomfort and suffer the fear of a life-threatening episode if I have an asthma attack.

10.  I can see the effects of ground-level ozone pollution in the Denver metropolitan area, in the form of haze, and I find them aesthetically displeasing.

11.  I have noticed that the air quality measurements can change during the day. I prefer to bike-commute, therefore deterioration of air quality during the day is especially problematic for me because I must avoid riding my bike if the air quality may deteriorate from the morning through the afternoon. If air quality deteriorates it could trigger an asthma attack if I am riding my bike, and then I may have to take the bus or find an alternative means to get home.

12.  In my experience, air quality in the Boulder and foothills area has gotten worse recently and has limited my ability to enjoy outdoor activities and has negatively impacted my health. My use of the inhaler has increased since air quality has deteriorated in the Boulder area.

13.  My ability to experience the natural world is more limited now with bad air quality because there are fewer areas I can visit without it being a potential problem for my asthma. Ironically, I must drive to get to areas of cleaner air, which costs time and money for gas. I also am psychologically and emotionally troubled by being forced to drive further to exercise because I must spend money on and burn gasoline, which has negative air quality effects. If I want to experience the outdoors, I am forced to choose between protecting the environment by

not driving further and doing things that keep me healthy such as outdoor physical activity.

14. My exercise regimen is critical to my health, quality of life, vitality, and longevity because regular exercise can reduce the risk of cholesterol and heart disease. To my knowledge, every male born before my parents (who died of natural causes) has died of heart disease before the age of 50. Among the men in my family, it is customary to compare our annual cholesterol test results. I have remained the only adult member of my family who has not been prescribed statins to regulate cholesterol, and rigorous aerobic exercise is a proven method for improving and maintaining those healthier outcomes. The less I can do that, the more it will cost me, in every way I can imagine. Limitations in my ability to exercise outdoors and maintain an active exercise regimen that I enjoy often casts a distressing burden on me psychologically and physically.

15. I am generally aware that the more asthma attacks one gets, the worse the condition is later. Prevention is important for me for some key reasons. If my asthma becomes worsened by an aggravated series of episodes, I could require more expensive medication or treatment. The more severe the treatment, the more severe the side effects are. I would

prefer the freedom to prevent the need to purchase and carry an EpiPen

everywhere I go. I would prefer to not have to fill an emergency stash of

prednisone or other steroids every time the previous prescription

expires. I would prefer to travel without the concerns and stress that I

might forget, not have, or could not afford these medications. And I

would certainly prefer to avoid the very notable and substantial side

effects of these more intensive treatments.

16.    In the years since my asthma has gotten worse, while running in

Colorado, I have made a practice of letting people in my life know where

my routine running routes are, or where I will be if not routine, because,

in the back of my mind, there is a chance that the next asthma attack

will be the one for which my current remedies provide too little relief. If

my airway were to close because of an asthma attack, I would only have

four minutes until I would be brain dead; the prospect of my death

because of an asthma attack triggered by poor air quality distresses me.

17.    In recent years, because of the COVID-19 pandemic, I will limit my

indoor exposure—in, for example, a recreational center, socially, or

professionally—in order to avoid contracting an infection and suffering

the respiratory symptoms that, combined with poor air quality, pose a

risk that is unacceptable to me. Before the pandemic, I could assess my

relative risk from my exposure to poor air quality more easily. Now, although I am fully vaccinated, even the post-vaccination symptoms of COVID-19, which I contracted in late March 2022, after getting the fullest vaccine immunity available, add a layer of severe concern. During my COVID-19 infection, I was periodically unable to get relief from my inhalers. Lacking a readily available remedy for lack of oxygen can be a terrifying experience. Now I am forced to consider the combined risks of a serious infection and poor air quality.

18.    I support the Center's lawsuit. If EPA disapproves the unauthorized exclusion of significant sources of emissions in the Colorado SIP, I will benefit from the resulting additional requirements to regulate ozone pollution. The improved air quality will better benefit my health and I will worry less about my health.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 31, 2022.

Scott Silber

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

No.  22-9546
_____

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner – Appellant*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY *et al.*,
*Respondent – Appellees*

_____

On Petition for Review of Final Action of the U.S.  Environmental Protection
Agency

_____

**ATTACHMENT 3: DECLARATION OF RICHARD READING**

_____

I, Richard P. Reading, declare that the following statements are true and
correct to the best of my knowledge, information, and belief, and are based on
my personal experiences and my review of publicly available information:

1.      I am over 18 years of age.

2.      I am a member of the Center for Biological Diversity.

3.      I live in Denver, Colorado. I have lived in Denver for the past 22 years.

4.      I received a master's degree and a Ph.D. in Wildlife Ecology from Yale

        University. I am the Director of Research and Conservation at the

        Butterfly Pavilion.

5.      I regularly enjoy running, bicycling, gardening, and walking my dog. I engage in these activities primarily at or near my home in Denver, Colorado.

6.      All my outdoor activities are negatively impacted by poor air quality, in some cases causing me serious respiratory distress and even asthma attacks. I can no longer exercise outdoors on bad air quality days, or I will suffer an asthma attack and require heavy medication. I particularly note that after traveling away from Denver, my asthma problems lessen, and they immediately worsen again upon returning to the region. These impacts seriously affect my quality of life.

7.      To address the problems I face with Denver's bad air quality, I have had to spend significant amounts of money for a) doctor and hospital (or urgent care) visits; b) medication (I am currently using four different medications to control my asthma); c) central air conditioning to filter the air coming into my home (I made this significant purchase on the advice of my doctor); and the need to use sick and vacation time to permit myself to heal from asthma attacks.

8.      I regularly follow the daily air report on local media, both television and the newspaper. If there is an air quality alert for the Greater Denver Metropolitan Area, I will limit my outdoor activities. For example, I

restrict any activities that require exertion outdoors. This means I
cannot run, bike, or garden and, in some cases, even walk my dog on bad
air quality days. In some cases, I have stopped running or biking in the
middle of workout or ride because of the breathing problems I faced.

9.    I am frustrated that I live in an area with excessive air pollution, and
that not enough is being done to remedy that pollution. I frequently
worry about the health impacts on my family, and I also worry that my
ongoing exposure to dirty air is impacting my health and shortening my
life.

10.   I understand that the Clean Air Act requires EPA to set National
Ambient Air Quality Standards, or NAAQS, for pollutants considered
harmful to public health and the environment. Ozone is one such
pollutant. EPA must also determine whether an area is in attainment or
not in attainment for the ozone NAAQS.

11.   I understand that EPA has determined, based on scientific evidence, that
exposure to ground-level ozone pollution causes numerous human
respiratory problems, including decreased lung function, asthma,
bronchitis, emphysema, and can inflame the lining of the lungs. I have
also read that repeated exposure can lead to permanent scarring of the
lungs. I understand that people with lung disease, children, older adults,

and people who are active outdoors, such as myself, may be particularly sensitive to ozone's effects.

12. I can see the effects of ground-level ozone pollution in the Denver metropolitan area, and I find them aesthetically displeasing. I am concerned that these problems will negatively impact my family, my pets, and wildlife in the region.

13. I support the Center's lawsuit. If EPA disapproves the unauthorized exclusion of significant sources of emissions in the Colorado SIP, I will benefit from the resulting additional requirements to regulate ozone pollution. The improved air quality will benefit my health, and I will worry less about my health.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2022.

_____

Richard P. Reading

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

No.  22-9546
_____

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner – Appellant*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY *et al.*,
*Respondent – Appellees*

_____

On Petition for Review of Final Action of the U.S.  Environmental Protection
Agency

_____

**ATTACHMENT 4: DECLARATION OF LORI ANN BURD**

_____

I, Lori Ann Burd, declare that the following statements are true and
correct to the best of my knowledge, information, and belief, and are based on
my personal experiences and my review of publicly available information:

1.      I am over 18 years of age.

2.      I am the director of the Environmental Health Program at the Center for

Biological Diversity ("the Center"). I am also a member of the Center.

3.      The Center's mission is to ensure the preservation, protection, and

restoration of biodiversity, native species, ecosystems, public lands and

water, and public health through science, policy, and law. Based on the

understanding that the health and vigor of human societies and the natural environment are closely linked, the Center is working to protect natural resources like air to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for the people that interact with, depend on, and cherish these natural resources. The Environmental Health Program is focused on protecting biodiversity and human health from toxic substances.

4.    In my role at the Center, I am involved in strategic decision making and setting policy priorities for the work that the Center does to reduce the threats to the environment and public health from toxic substances, including air pollution.

5.    The Center's Environmental Health Program works to help reduce the threats posed by air pollution through scientific, legal, and policy mechanisms. I strive to represent the interests of our members in areas affected and am concerned about how the negative air quality is impacting them, their families, and the environment that they enjoy.

6.    Combating air pollution is an issue that is very important to me because I understand the health impacts of air pollutants. I am deeply troubled by the effects that they have on the environment and human health. I am aware of studies linking air pollution to a range of health impacts, such

as respiratory problems, increased incidences of hospitalization, and premature mortality. I have a close friend, a physician, who suffers from severe asthma, and on many occasions have witnessed the devastating effects asthma has had on her ability to work, care for her young child, and function. I have seen specific instances where increased air pollution has exacerbated her asthma.

7.  I am further aware that air pollution can also negatively affect the health of wildlife and plant life that I and the Center's other members appreciate viewing in the outdoors. I am further aware that air pollution can lead to haze and negatively affect my and the Center's other members' experiences in nature and the outdoors, and can lead to broader ecosystem effects by affecting water quality and nutrient cycles.

8.  I am aware that EPA approved Colorado's permitting program for new and modified sources of air pollution in the Metro Denver / North Front Range nonattainment area.

9.  I am also aware that the Center's ability to provide public comment on the permitting program was impaired by EPA's failure to include the specific language of the regulatory program on which it was taking action as part of the rulemaking docket.

10.    I am further aware that this permitting program improperly exempts

certain significant types of emissions from the determination of

whether a source is major or minor, including temporary emissions and

emissions from internal combustion engines on vehicles. The excess

pollution that will result is concerning to myself and runs directly

counter to the Center's goals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 1, 2022.

_____

Lori Ann Burd