No. 22-9546

ORAL ARGUMENT NOT REQUESTED

**In the United States Court of Appeals
For The Tenth Circuit**

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

On Petition for Review of Final Action of the
U.S. Environmental Protection Agency

***AMICI CURIAE* BRIEF OF AMERICAN PETROLEUM
INSTITUTE, INC. AND COLORADO OIL AND GAS
ASSOCIATION IN SUPPORT OF RESPONDENTS**

Christopher L. Colclasure
BEATTY & WOZNIAK, PC
1675 Broadway, Suite 600
Denver, Colorado 80202
Phone: (303) 407-4499
ccolclasure@bwenergylaw.com

*Counsel for Colorado Oil and
Gas Association*

John H. Bernetich
Jennifer L. Biever
Corey Y. Lim
WILLIAMS WEESE PEPPLE &
FERGUSON PC
1801 California Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 861-2828
jbernetich@williamsweese.com
jbiever@williamsweese.com
clim@williamsweese.com

*Counsel for American Petroleum
Institute, Inc.*

January 24, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the American Petroleum Institute, Inc. ("API") and the Colorado Oil and Gas Association ("COGA") certify that they are non-profit business federations.  Neither API nor COGA has any parent entity, and no publicly held corporation or similarly situated legal entity owns a 10% or greater ownership in API or COGA.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES....................................................................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS .........................iv

STATEMENT OF RELATED CASES ......................................................viii

*AMICI CURIAE'S* IDENTITY, INTEREST, AND AUTHORITY TO FILE ..............................................................................................................ix

INTRODUCTION AND SUMMARY OF ARGUMENT............................1

ADDITIONAL FACTUAL BACKGROUND.............................................3

ARGUMENT ............................................................................................7

I.    Including temporary construction emissions as part of a source's PTE would upend Colorado's NSR permitting programs...............7

    A.    EPA regulations do not require consideration of temporary construction emissions in determining whether a source is a "major stationary source." ......................................................9

    B.    The modification provisions in Colorado's NNSR program and EPA's regulations make clear that temporary construction emissions are not included in a source's PTE..13

II.   Construction emissions are not required to be considered when determining whether an oil and gas source is a "major stationary source."............................................................................16

    A.    Summary of the drilling and completions process ...............16

    B.    Including temporary construction and exploration emissions in a wellpad's annual tons-per-year calculation is unworkable. ...........................................................................18

    C.    Temporary emissions from drilling and completions activities are regulated under other Clean Air Act programs..................................................................................19

D.  Granting the Petition would disrupt other states' established permitting procedures and impact numerous air permits...24

CONCLUSION .......................................................................26

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................28

CERTIFICATE OF DIGITAL SUBMISSION ........................................29

CERTIFICATE OF SERVICE................................................................30

# TABLE OF AUTHORITIES

## CASES

*Engine Mfrs. Ass'n v. EPA,*
    88 F.3d 1075 (D.C. Cir. 1996)........................................20, 21

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)..............................................................21

*United States v. Cinergy Corp.,*
    384 F. Supp. 2d 1272 (S.D. Ind. 2005) ...............................13

*United States v. Cinergy Corp.,*
    458 F.3d 705 (7th Cir. 2006)...............................................13

*United States v. DTE Energy Co.,*
    711 F.3d 643 (6th Cir. 2013)............................................2, 26

*United States v. Louisiana-Pac. Corp.,*
    682 F. Supp. 1141 (D. Colo. 1988) .......................................11

*Utah Physicians for a Healthy Envt. v. Diesel Power Gear,*
    21 F.4th 1229 (10th Cir. 2021) ...........................................20

## STATUTES

42 U.S.C. § 7410(a)(1)................................................................6

42 U.S.C. § 7411......................................................................22

42 U.S.C. § 7411(a)(4)..............................................................13

42 U.S.C. § 7479(2)(C)..............................................................13

42 U.S.C. § 7502(c)(5) ...............................................................3

42 U.S.C. § 7503.........................................................................3

42 U.S.C. §§ 7521 – 7590..........................................................20

42 U.S.C. § 7547......................................................................21

42 U.S.C. § 7550(10) ...........................................................20, 21

iv

42 U.S.C. § 7602(j) .................................................................... 9

REGULATIONS

40 C.F.R. § 51.165(a)(1)(iii) ..................................... 1, 8, 10, 11, 12, 18, 19

40 C.F.R. § 51.165(a)(1)(iv)(A)(1) ........................................................ 3, 9

40 C.F.R. § 51.165(a)(1)(v)(A) .............................................................. 14

40 C.F.R. § 51.165(a)(1)(vi)(A) ............................................................... 3

40 C.F.R. § 51.165(a)(1)(vi)(A)(2) ........................................................ 14

40 C.F.R. § 51.165(a)(1)(vi)(F) ............................................................. 14

40 C.F.R. § 51.165(a)(1)(xxviii)(A) ....................................................... 15

40 C.F.R. § 51.165(a)(2)(ii)(D) ............................................................. 15

40 C.F.R. Part 60 Subpart OOOOa ................................................... 3, 20

40 C.F.R. § 60.5375a .......................................................................... 22

40 C.F.R. § 60.5375a(a)(1) .................................................................. 23

40 C.F.R. § 60.5375a(a)(1)(ii) .............................................................. 23

40 C.F.R. § 60.5375a(a)(3) .................................................................. 23

40 C.F.R. Part 1039 ............................................................................ 21

40 C.F.R. Part 1065 ............................................................................ 21

40 C.F.R. Part 1068 ............................................................................ 21

40 C.F.R. § 1068.30 .................................................................. 21, 22, 24

5 Colo. Code Regs. § 1001-5 .................................................................. 4

5 Colo. Code Regs. § 1001-5:3.A.I.B.37 ................................................ 3, 5

5 Colo. Code Regs. § 1001-5:3:D.II.A.7 ................................................. 25

5 Colo. Code Regs. § 1001-5:3D.II.A.25.f ............................................ 4, 11

5 Colo. Code Regs. § 1001-9 ...................................................................... 20

5 Colo. Code Regs. § 1001-9:D.VI ............................................................ 16

5 Colo. Code Regs. § 1001-9:D.VI.A.3 ...................................................... 17

5 Colo. Code Regs. § 1001-9:D.VI.A.4 ...................................................... 17

5 Colo. Code Regs. § 1001-9:D.VI.A.6 ...................................................... 17

5 Colo. Code Regs. § 1001-9:D.VI.A.8 ...................................................... 18

5 Colo. Code Regs. § 1001-9:D.VI.A.11 ..................................................... 17

5 Colo. Code Regs. § 1001-9:D.VI.D ........................................................ 23

11 Miss. Admin. Code Pt. 2, R. 2.2(B)(8) ................................................. 25

10 Mo. Code State Regs. § 10-6.020(2)(P)(38) ......................................... 25

New Mexico Admin. Code § 20.2.72.203(A)(3) ......................................... 25

25 Pa. Code § 127.204(a) ........................................................................... 25

30 Texas Admin. Code § 116.611(c) ........................................................... 25

## OTHER AUTHORITIES

59 Fed. Reg. 31,306 (June 17, 1994) ....................................................... 21

77 Fed. Reg. 21,453 (Apr. 10, 2012) .......................................................... 4

83 Fed. Reg. 31,068 (July 3, 2018) ............................................................. 5

83 Fed. Reg. 62,998 (Dec. 6, 2018) ........................................................ 5, 6

84 Fed. Reg. 18,991 (May 3, 2019) ............................................................. 5

87 Fed. Reg. 29,232 (May 13, 2022) ................................................. 6, 7, 13

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to 10th Circuit Rule 28.2(C)(4), the following is a glossary of the acronyms and abbreviations used in this brief:

| | |
|---|---|
| Act | Clean Air Act |
| APCD | Air Pollution Control Division |
| API | American Petroleum Institute |
| AQCC | Air Quality Control Commission |
| COGA | Colorado Oil and Gas Association |
| EIA | U.S. Energy Information Administration |
| EPA | U.S. Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standard |
| NNSR | Nonattainment New Source Review |
| NSR | New Source Review |
| PTE | Potential to emit |
| PSD | Prevention of Significant Deterioration |
| SIP | State Implementation Plan |

## STATEMENT OF RELATED CASES

*Amici* are not aware of any prior or related appeals.

## *AMICI CURIAE'S* IDENTITY, INTEREST, AND AUTHORITY TO FILE

American Petroleum Institute and Colorado Oil and Gas Association submit this brief in support of Respondents United States Environmental Protection Agency and Michael S. Regan (collectively, "EPA") pursuant to Fed. R. App. P. 29(a).  American Petroleum Institute ("API") is a nationwide, non-profit trade association that represents more than 600 companies involved in every aspect of the petroleum and natural gas industry.  Its members range from the largest integrated companies to the smallest independent oil and gas producers.  API's members include producers, refiners, suppliers, marketers, pipeline operators, and marine transporters, as well as service and supply companies that support the industry.  API is also the worldwide leading body for establishing standards that govern the oil and natural gas industry.

Colorado Oil and Gas Association's ("COGA") mission is to be the unified political and regulatory voice for the oil and natural gas industry in Colorado, and to support its members through advocacy, partnerships, education and stakeholder engagement.  COGA members represent multiple sectors of the oil and gas industry in Colorado from

drilling and exploration activities to production, processing and transportation, many with facilities in the Denver Metro/North Front Range 8-hour ozone nonattainment area.

API and COGA each have a substantial interest in this case. Members of API and COGA could be subject to the Nonattainment New Source Review ("NNSR") permitting program of the Clean Air Act ("Act") when they seek to construct new major sources or to complete major modifications at existing sources located in an area that is not in attainment with a National Ambient Air Quality Standard ("NAAQS"). Their members construct and operate well production facilities, which are the type of stationary source singled out by this Petition for Review. The NNSR permitting program applies to new "major stationary sources" and "major modifications" at major stationary sources in nonattainment areas. A source's potential to emit ("PTE") determines whether API's and/or COGA's members are subject to NNSR permitting requirements. Colorado's Regulation Number 3, codified at Colo. Code Regs. § 1001-5, uses the same definitions of major stationary source, major modification, and PTE for determining whether sources in

attainment areas are subject to the Act's Prevention of Significant Deterioration ("PSD") requirements.

The NNSR permitting program adopted by Colorado into its State Implementation Plan ("SIP") excludes emissions from certain temporary construction activities from a source's PTE.  EPA has long approved of Colorado's NNSR permitting program and the exclusion of temporary construction emissions in a PTE calculation.  Petitioner, the Center for Biological Diversity (the "Center"), challenges this long-existing exclusion by seeking review of EPA's approval of Colorado's NNSR Permit Program Certification for the 2015 8-Hour Ozone NAAQS.  87 Fed. Reg. 29,232 (May 13, 2022), Supplemental Excerpts of Record ("SER") 024–28.  EPA's approval of the certification did not adopt or approve of any revisions to Colorado's existing NNSR permitting program.

API and COGA have a substantial interest in participating in this case to support EPA's approval of Colorado's certification of its existing NNSR permitting program.  This lawsuit threatens to upend Colorado's NNSR (and also PSD) permitting program for all industries and would set adverse national precedent for whether sources are considered

"major" in both attainment and nonattainment areas. An adverse decision could prompt other states where API or COGA members operate to revise their regulations or prompt EPA to issue a "SIP call" for other states to revise their SIPs. 42 U.S.C. § 7410(k)(5). Were the Court to grant the Petition, API and COGA members may be subject to more extensive and onerous permitting requirements than under the current permitting framework and intended under the Act.

Pursuant to Fed. R. App. P. 29(a)(2), *amici* state that all parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than API and COGA and their members contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, Colorado has determined whether a source is a "major stationary source" and whether a modification to an existing source is a "major modification" (each triggering more rigorous permitting requirements) based on whether a source's operations have the capacity to emit a threshold number of tons per year. That interpretation fully complies with EPA requirements, which provide that whether a source is a "major stationary source" (and whether a modification is a "major modification") depends on the annual amount of a pollutant "emit[ted] under" the source's "physical and operational design." 40 C.F.R. § 51.165(a)(1)(iii).

The Center asks this Court to ignore EPA's regulation, upend Colorado's and other states' New Source Review ("NSR") permitting programs[1], and interpret EPA's definition of a "major stationary source" to require consideration of emissions from *construction* of a source in determining whether the source is a "major" source.

---

[1] NSR programs include permitting for major stationary sources and major modifications in areas that are in attainment of applicable air quality standards (referred to as "Prevention of Significant Deterioration" (or PSD)) and in nonattainment areas (referred to as "nonattainment NSR" (or NNSR)).

No court has ever interpreted the Act or EPA's implementing regulations in this way, and for good reason. Emissions from construction of a source are, by definition, not emitted during the source's operations, and therefore need not be considered in determining whether the source is major. The NSR program is intended to address emissions from post-construction operation, not from pre-operation construction. *See United States v. DTE Energy Co.,* 711 F.3d 643, 644 (6th Cir. 2013) (EPA regulations require owners and operators requesting a NSR permit to forecast "to what extent emissions from the source will increase *following construction.*" (emphasis added)).

The Center argues that the Act requires consideration of emissions from construction of an oil and gas wellpad because, according to the Center, excluding construction emissions would leave a "gaping loophole" in Colorado's air pollution regulations. Pet. Br. at 4. That is not true; other provisions of the Act regulate those emissions. Emissions from engines used in drilling and hydraulic fracturing are regulated as mobile sources under Title II of the Act. And emissions that occur during completion of the well and the pre-operation

"flowback" phase are regulated under the federal New Source Performance Standards for the oil and natural gas industry, *see* 40 C.F.R. Part 60 Subpart OOOOa, and Colorado regulations.

The Court should deny the Petition because no provision of the Act or EPA's regulations requires Colorado to consider emissions from temporary construction of the source in determining whether the source is a "major stationary source."[2]

## ADDITIONAL FACTUAL BACKGROUND

*Amici* provide the following summary of Colorado's SIP revisions, and EPA's approval of those revisions, related to Colorado's NNSR permitting program.  As detailed below, the provision in Colorado's SIP excluding emissions from certain temporary construction activities from a source's PTE has been on the books and part of Colorado's regulations

---

[2] The "nonattainment NSR" or "NNSR" program is a permitting program for new "major stationary source" and any "major modification" of an existing stationary source in an area that is in nonattainment of a NAAQS.  42 U.S.C. §§ 7502(c)(5), 7503.  The Colorado SIP's definition of PTE is used to determine whether a newly constructed source is a "major stationary source" as well as whether a modification is a "major modification."  5 Colo. Code Regs. § 1001-5:3.A.I.B.37; *see also* 40 C.F.R. § 51.165(a)(1)(iv)(A)(1) ("major stationary source"); 40 C.F.R. § 51.165(a)(1)(vi)(A) & (a)(1)(xxviii)(A).  Because the Center's brief focuses on PTE in the context of a "major stationary source" determination, *amici* primarily focus on this issue.

since at least 2005.  The Center did not challenge this provision or assert that it did not meet federal requirements until 2022.

The 2005 Colorado SIP, approved by EPA in 2012, includes the provision that the Center now asserts does not meet federal requirements.  *See* Colorado Dep't of Pub. Health and Env't, Air Quality Control Commission, Regulation Number 3, codified at 5 Colo. Code Regs. § 1001-5 (Rev. Apr. 16, 2004), at 154[3]; 77 Fed. Reg. 21,453 (Apr. 10, 2012); *see also* Resp. Br. at 32-33 (EPA first approved Colorado's NSR permitting program as meeting the 1990 amendments to the Act in 1994).  The Center's claims are based around the following portion of the definition of a "major stationary source:"

> Emissions caused by indirect air pollution sources (as defined in Section I.B.24. of Part A of this regulation), emissions from internal combustion engines on any vehicle, and emissions resulting from temporary activities, such as construction or exploration, shall be excluded in determining whether a source is a major stationary source.

5 Colo. Code Regs. § 1001-5:3.D.II.A.25.f.  During the 18 years (or more) that this provision has been in Colorado's SIP and codified in the

---

[3] *Available at* http://www.regulations.gov, document number EPA-R08-OAR-2005-CO-0003-0006.

4

Colorado regulations, the Center never sought judicial review asserting

that it does not meet federal requirements until 2022.

Since 2012, EPA has approved certain SIP revisions to other

portions of Colorado's NNSR permitting program, but those SIP

revisions did not alter the definition of "potential to emit" codified at 5

Colo. Code Regs. § 1001-5:3.A.I.B.37. *See* 83 Fed. Reg. 31,068 (July 3,

2018), ROA, Vol. I at 0725 (EPA approving Colorado's NNSR program

for the 2008 8-hour ozone NAAQS); 84 Fed. Reg. 18,991 (May 3, 2019),

ROA, Vol. I at 0722 (EPA approving Colorado's SIP revisions to address

federal PSD and NNSR requirements).  The Center did not seek judicial

review of EPA's conclusion that Colorado's NNSR program was

consistent with EPA regulations.

Even though EPA had already approved Colorado's NNSR

permitting program, upon promulgation of the 2015 8-hour ozone

NAAQS, Colorado was obligated to submit to EPA either a SIP revision

or a certification that its existing SIP complies with the Act's

requirements.  83 Fed. Reg. 62,998, 63,001 (Dec. 6, 2018), ROA, Vol. I at

0535 ("air agencies may certify that an existing regulation is adequate

to meet certain nonattainment area planning requirements for a revised

ozone NAAQS, in lieu of submitting a new revised regulation"); 42

U.S.C. § 7410(a)(1).  EPA evaluates SIP certifications in the same

manner as SIP revisions.  83 Fed. Reg. at 63,002, ROA, Vol. I at 0536.

In 2020, the Colorado Air Quality Control Commission ("AQCC") (the

rulemaking authority for air quality matters in Colorado) released for

public comment a draft certification.  ROA, Vol. I at 0010.  The Center

submitted comments on the AQCC's draft certification, but did not

assert to the AQCC that Colorado's NNSR permitting program or its

definition of "major stationary source" was unlawful or insufficient.

ROA, Vol. I at 0058–63.  In 2020, Colorado submitted its certification

for EPA approval.  ROA, Vol. I at 0009–0118.  EPA approved Colorado's

certification on May 13, 2022.  87 Fed. Reg. 29,232 (May 13, 2022), SER

024–28 (the final rule challenged in this matter).

Through this final rule, EPA *did not approve any actual revisions*

to Colorado's SIP; it merely approved Colorado's certification that its

SIP complies with federal requirements for the 2015 8-hour ozone

NAAQS.  Thus, the Center challenges *only* EPA's approval of Colorado's

certification that its SIP complies with the federal Act.  87 Fed. Reg. at

29,232, SER 024 (In the final rule, EPA is "approving" Colorado's

6

certification that "Colorado has fulfilled, *through previous SIP revisions*, Nonattainment New Source Review (NNSR) Permit Program requirements" (emphasis added)); 87 Fed. Reg. at 29,233, SER 025 ("our action does not approve any actual revisions to the text of the Colorado SIP[.]").  As a consequence, this Court can provide no remedy to the Center that would directly vacate or remand Colorado's NNSR permitting regulations (or the definitions challenged by the Center that are contained within those regulations).

## ARGUMENT

## I. <u>Including temporary construction emissions as part of a source's PTE would upend Colorado's NSR permitting programs.</u>

The Center alleges that a decades-old definition of "major stationary source," codified at 5 Colo. Code Regs. § 1001-5:3D.II.A.25.f, does not meet federal requirements regarding a state's NNSR permitting program.  That argument fails: nothing in EPA's NNSR permitting regulations requires Colorado's SIP to include "emissions from internal combustion engines on any vehicle" or "emissions resulting from temporary activities, such as construction or exploration" in determining whether a source to be constructed is a "major

stationary source." *See* 40 C.F.R. § 51.165.  Colorado's treatment of temporary construction emissions under its NNSR permit program is entirely consistent with federal requirements.

The Center argues that emissions from temporary construction must be counted when determining whether a source is major because EPA's definition of PTE excludes only two types of emissions, namely secondary emissions and fugitive emissions, and that neither exclusion applies.  Pet. Br. at 30–31.  The Center argues at length that emissions from drilling and well completion activities are not secondary emissions, and thus are not excluded.  *Id.* at 30-36.  But it does not matter whether an exclusion applies because temporary construction emissions fall wholly outside the basic definition of PTE.  *See* 40 C.F.R. § 51.165(a)(1)(iii).  The Center's claims fail because it does not—and cannot—make the foundational demonstration that these emissions are part of the source's PTE.  There is no need to carve emissions out of the definition of PTE because they were never included in the first place.  However, even if these emissions were within the definition of PTE, EPA reasonably determined they are secondary emissions and thus are

excluded from the PTE calculation.  *Amici* do not reiterate EPA's arguments regarding secondary emissions here.  *See* Rsp. Br. at 36–40.

**A.    EPA regulations do not require consideration of temporary construction emissions in determining whether a source is a "major stationary source."**

Whether a source is a "major stationary source" (triggering the need for a more rigorous major source permit) or a minor source (with less rigorous permitting requirements) depends on the source's annual PTE.  40 C.F.R. § 51.165(a)(1)(iv)(A)(1).  If EPA (or the relevant state permitting authority) determines that a new source's potential to emit a regulated NSR pollutant exceeds an established annual emissions threshold, expressed in tons per year of emissions, then the source is deemed a "major stationary source."  For sources that emit ozone in the Denver Metro/North Front Range nonattainment area, the PTE threshold is 100 tons per year for purposes of the 2015 8-hour ozone NAAQS.  42 U.S.C. § 7602(j).

A source's PTE is the maximum capacity of the stationary source to emit designated pollutants once the source is fully operational.  EPA has excluded temporary construction emissions from the definition of PTE for over 40 years.  Under EPA's policy, when determining whether

a new source is a major stationary source, "the emissions which will result *only from operation of the source* and not the emissions which will result from construction of the source should be considered." EPA, Memorandum Re "PSD Applicability – Temporary Emissions," (Dec. 11, 1978), *available at* https://www.epa.gov/sites/default/files/2015-07/documents/tmpemisn.pdf (emphasis added). To reflect this policy, which has been in place since implementation of the 1977 amendments to the Act that established the NSR program, EPA promulgated the definition of PTE in 40 C.F.R. § 51.165(a)(1)(iii), which provides:

> Potential to emit means the maximum capacity of a stationary source to emit a pollutant *under its physical and operational design.* Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

(Emphasis added). Thus, a source's PTE does not include all emissions that are incidental to or related to a source. Instead, PTE includes only the maximum capacity of a source to emit "under" the source's "physical

and operational design." *Id.*; *see also United States v. Louisiana-Pac. Corp.*, 682 F. Supp. 1141, 1157–58 (D. Colo. 1988) (PTE "contemplates the maximum emissions that can be generated while operating the source as it is intended to be operated and as it is normally operated.").

Colorado's SIP complies with this definition. Colorado's SIP provides that "emissions from internal combustion engines on any vehicle, and emissions resulting from temporary construction activities, such as exploration, shall be excluded in determining whether a source is a major stationary source." 5 Colo. Code Regs. § 1001-5:3D.II.A.25.f, ROA, Vol. II at 1066. This provision simply clarifies that mobile source emissions and temporary construction and exploration emissions are not included in the source's PTE. Nor could they be, because they are not "emit[ted] . . . under [the source's] physical and operational design." 40 C.F.R. § 51.165(a)(1)(iii).

As the Center concedes, emissions from temporary construction activities result from *construction* of the source, not operation of it. Pet. Br. at 19 (conceding that the emissions the Center focuses on occur "before" the source "begin[s] producing oil and gas"). EPA's interpretation that a source's PTE includes emissions from operation of

11

the source, and does not include emissions from construction of the source, is reasonable. *See* Rsp. Br. at 36–40.

The Center's brief does not once quote EPA's definition of PTE. *See* 40 C.F.R. § 51.165(a)(1)(iii).  That is surprising, given that the Center's argument hinges on the assumption that mobile source and temporary construction emissions are part of a source's PTE unless specifically excluded.  Instead, the Center avoids that definition because, under a plain reading of it, temporary construction emissions do not fall within EPA's definition of PTE – as EPA clarified four decades ago.  In fact, the Center points to nothing in the Act or its implementing regulations that require the inclusion of temporary construction emissions in the PTE calculation.

Even if temporary construction emissions fell within the definition of PTE in 40 C.F.R. § 51.165(a)(1)(iii), EPA reasonably concluded that those emissions should still be excluded from a "major source" or "major modification" PTE calculation because those emissions are "secondary emissions," which "do not count in determining the potential to emit of a stationary source."  40 C.F.R. § 51.165(a)(1)(iii); *see also* 40 C.F.R. § 51.165(a)(1)(iii) (defining "secondary emissions"); 87 Fed. Reg. at

29,234, SER 026 (temporary emissions are excluded as secondary emissions).

### B. The modification provisions in Colorado's NNSR program and EPA's regulations make clear that temporary construction emissions are not included in a source's PTE.

The same regulation that the Center relies upon, 40 C.F.R. § 51.165, specifies that temporary construction emissions are not included when calculating the change in emissions resulting from modification of a stationary source. Emissions from construction of a new source should be calculated in the same manner because new sources and modified sources face the same general permitting requirements, and modification is included in the definition of "construction."[4] *See United States v. Cinergy Corp.,* 384 F. Supp. 2d 1272, 1276 (S.D. Ind. 2005), aff'd, 458 F.3d 705 (7th Cir. 2006) (In determining whether a project is a major modification, "[a]n owner or operator must make a preconstruction projection of whether and how

---

[4] The Act defines "construction" to include "modification," which in turn is defined as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. §§ 7411(a)(4), 7479(2)(C).

13

much emissions will increase at a particular unit *following construction*." (emphasis added)).

Under EPA regulations, the amount of the "net emissions increase" resulting from the modification affects whether the modification is considered "major." 40 C.F.R. § 51.165(a)(1)(v)(A). EPA's regulations provide different methodologies through which an operator may calculate the net emissions increase. Those methodologies make clear that temporary construction emissions are not included in the PTE calculation. Specifically, when determining whether the modification results in a "net emissions increase," the starting point is whether any emissions increased. 40 C.F.R. § 51.165(a)(1)(vi)(A)(2). In determining whether emissions increased, EPA excludes emissions from construction of the modification or other temporary emissions. *See* 40 C.F.R. § 51.165(a)(1)(vi)(F) ("An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred *becomes operational* and begins to emit a particular pollutant." (emphasis added)). Thus, emissions from post-modification operations, not emissions from

construction of the modification, determine whether the modification is major.

Similarly, under another of the methodologies for calculating emissions increases, when an owner proposes to modify a source by constructing a "new emissions unit," EPA determines whether the modification is a "major modification" by comparing the "potential to emit . . . from each new emissions unit *following completion of the project*" with "baseline actual emissions." 40 C.F.R. § 51.165(a)(2)(ii)(D) (emphasis added). And when an owner or operator proposes to modify existing emissions units, the calculation makes clear that temporary emissions associated with the construction or modification of the units are not included. *See* 40 C.F.R. § 51.165(a)(1)(xxviii)(A) ("Projected actual emissions means, the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant . . . *following the date the unit resumes regular operation after the project*[.]" (emphasis added)). Like major stationary source determinations, the regulatory structure for modifications demonstrates that a source's emissions calculations are intended to identify the amount of a specified pollutant a source will emit annually *during the*

*source's operations*, not during temporary construction activities. Additionally, this regulatory structure demonstrates the reasonableness of EPA's conclusion that emissions from temporary construction activities are "excluded from the source's PTE." *See* Pet. Br. at 36-37.

## II.    Construction emissions are not required to be considered when determining whether an oil and gas source is a "major stationary source."

Because the Center's brief focuses on emissions from oil and gas sources—particularly emissions from drilling, well completions, hydraulic fracturing, and flowback—*amici* provide the following explanation of the process to construct an oil and gas well production facility.

### A.    Summary of the drilling and completions process

Constructing a well production facility involves multiple steps. Construction activities include well drilling and completions, as well as installing surface equipment and aboveground and underground flowlines, which transport the oil or gas.  The AQCC defines drilling, completions, and related terms in its Regulation Number 7, Part D, Section VI (codified at 5 Colo. Code Regs. § 1001-9:D.VI), which governs pre-production and early production activities.  Although these

definitions are not directly applicable to Colorado's NNSR permitting program, they provide a useful overview of the activities at issue.

Drilling is "the process to bore a hole to create a well for oil and/or natural gas production." 5 Colo. Code Regs. § 1001-9:D.VI.A.3. After a well is drilled, it must be "completed" before it can produce oil and/or natural gas. "Well completion" is the process that allows the well to expel drilling fluids, hydraulic fracturing fluids, water, oil, and natural gas. 5 Colo. Code Regs. § 1001-9:D.VI.A.11.

Well completions activities encompass both hydraulic fracturing and flowback. Hydraulic fracturing is an optional process that creates fissures in the rock or other geologic materials surrounding the well, establishing pathways for oil or natural gas to flow into the well. The process involves injecting high-pressure water and other constituents including proppants (such as sand) to prevent the fissures from closing. *See* 5 Colo. Code Regs. § 1001-9:D.VI.A.6. The AQCC defines flowback as "the process of allowing fluids and entrained solids to flow from a well following stimulation." 5 Colo. Code Regs. § 1001-9:D.VI.A.4. "The term flowback also means the fluids and entrained solids flowing from a well after drilling or hydraulic fracturing or refracturing." *Id.* Drill rigs

17

and hydraulic fracturing pumps are generally powered by engines that emit nitrogen oxides and volatile organic compounds.  *See* ROA, Vol. I at 0049.  Well completions may also emit these compounds.  *See id.*

Drilling, hydraulic fracturing, and flowback activities for a well occur *before* the well becomes operational—*i.e.*, before the well produces oil or natural gas.  5 Colo. Code Regs. § 1001-9:D.VI.A.8 ("Pre-production operations" means "drilling through the hydrocarbon bearing zones, hydraulic fracturing or refracturing, drill-out, and flowback of an oil and/or natural gas well."); Pet. Br. at 19.  Because drilling, completion, hydraulic fracturing, and flowback are pre-production activities, emissions during those processes are not "emit[ted] . . . under [the source's] physical and operational design" and are therefore not included in the source's PTE.  *See* 40 C.F.R. § 51.165(a)(1)(iii).

## B. Including temporary construction and exploration emissions in a wellpad's annual tons-per-year calculation is unworkable.

For an oil and gas well production facility, PTE is calculated assuming that every emissions unit at the wellpad operates non-stop at full throttle for the entire year, unless emissions from the source are

limited by design constraints, mandatory pollution control equipment, or enforceable emissions limits.  40 C.F.R. § 51.165(a)(1)(iii).  It is infeasible to apply these assumptions to emissions during the temporary, pre-operational phases for a well.  It is impossible to square up the temporary nature of pre-production construction emissions with the EPA-required method of calculating PTE by assuming the simultaneous and full-year operation of all emission units.  Inclusion of construction emissions would overstate the emissions beyond the first year and upend the Act's permitting process applicable to major stationary sources.

### C.    Temporary emissions from drilling and completions activities are regulated under other Clean Air Act programs.

EPA and Colorado have not left a "gaping loophole" in their permitting programs by excluding temporary construction emissions from PTE, as the Center asserts.  Pet. Br. at 4.  These emissions are simply regulated through other mechanisms.  The Center cites emissions from oil and gas sources as an example.  However, emissions from engines used in drilling and hydraulic fracturing are comprehensively regulated as "mobile sources" under Title II of the Act,

42 U.S.C. §§ 7521–7590. Emissions from the well completion and flowback phases are regulated under the federal New Source Performance Standards for the oil and natural gas industry, 40 C.F.R. Part 60 Subpart OOOOa, and under AQCC Regulation Number 7 (codified at 5 Colo. Code Regs. § 1001-9).

Mobile sources, such as internal combustion engines "sitting on a vehicle such as a flat-bed truck" (Pet. Br. at 38), are regulated under Title II of the Act. 42 U.S.C. §§ 7521–7590. The statutory and regulatory framework applicable to mobile sources is separate and distinct from EPA's NSR and NNSR stationary source permitting programs described at 40 C.F.R. § 51.165. *See* 42 U.S.C. § 7550(10). The "regulatory difference between stationary and mobile sources" is integral to the structure of the Act, including because Congress preempted most state regulation of mobile source emission standards. *Utah Physicians for a Healthy Envt. v. Diesel Power Gear*, 21 F.4th 1229, 1236 (10th Cir. 2021) (citations and punctuation omitted); *see also Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1093–94 (D.C. Cir. 1996) (explaining the Act's preemption of most state regulation of mobile source emission standards).

The Center's claims conflict with the Act's distinction between mobile and stationary sources and ask the Court to interpret the NSR permitting program in a way that abrogates this distinction. The U.S. Supreme Court has warned against such disjointed interpretations. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole") (citations and punctuation omitted)).

In the 1990 amendments to the Act, Congress directed EPA to regulate nonroad engines under Title II of the Act. 42 U.S.C. § 7547; *Engine Mfrs. Ass'n*, 88 F.3d at 1080. EPA promulgated standards for nonroad engines in 1994. 40 C.F.R. Parts 1039, 1065, 1068; 59 Fed. Reg. 31,306 (June 17, 1994). Under EPA regulations, an internal combustion engine on a drilling rig is a "nonroad engine" subject to Title II of the Act (regulating mobile sources), not Title I (stationary sources). *See* 40 C.F.R. § 1068.30 (a "nonroad engine" is "an internal combustion engine" that is "used in or on a piece of equipment that is self-propelled" or "is portable or transportable"); 42 U.S.C. § 7550(10) (defining "nonroad engine").

EPA regulations deem an internal combustion engine that otherwise meets the requirements of a "nonroad engine" to be a stationary source (rather than a mobile source) if the engine "remains or will remain at a location for more than 12 consecutive months." 40 C.F.R. § 1068.30. Internal combustion engines used during the drilling and hydraulic fracturing phase do not remain at a single location for 12 months and are therefore regulated under Title II of the Act. The Center's arguments that emissions from these engines should also be regulated under Title I is contrary to Congressional intent and the structure of the Act. And even if drilling rigs and completion engines were not "nonroad" engines, to the extent used during temporary construction activities, emissions from such engines would still not be included in PTE for all the reasons stated above.

Similarly, well completion and flowback emissions are subject to the Act's New Source Performance Standards. *See* 42 U.S.C. § 7411; 40 C.F.R. § 60.5375a. After a well is hydraulically fractured, the "flowback" from the well—the fluids and entrained solids that are released following hydraulic fracturing—is routed to a device (called a "separator") that separates gas from liquids. Gas recovered from the

separator is then routed to a flowline or collection system (*i.e.*, for transport to market), reinjected into a well, or beneficially used. *See* 40 C.F.R. § 60.5375a(a)(1). If none of these options are technically feasible for the gas recovered from the separator, the gas is combusted. 40 C.F.R. § 60.5375a(a)(3). Meanwhile, liquids recovered by the separator are sent to a completion or storage vessel, reinjected, or routed to a collection system. 40 C.F.R. § 60.5375a(a)(1)(ii). Colorado goes beyond these federal requirements by requiring operators to use state-of-the-art vapor-tight enclosed flowback vessels and to route emissions from the flowback vessels to a high-efficiency emissions control device. *See* 5 Colo. Code Regs. § 1001-9:D.VI.D.[5]

EPA and Colorado comprehensively regulate emissions that occur during construction of an oil and gas well. The Center's argument that excluding temporary construction emissions from a source's PTE results in a "gaping loophole" is meritless.

---

[5] This provision is a "state-only" regulation and is not part of Colorado's SIP.

### D. Granting the Petition would disrupt other states' established permitting procedures and impact numerous air permits.

Granting the Petition would have far-reaching implications to the Act's permitting programs applicable to the oil and gas industry and other industries. It would undermine Congress' decision to regulate mobile and stationary sources differently, upend EPA's established method for calculating PTE, and conflict with EPA's determination to classify nonroad engines as stationary sources except in narrow, specified cases. 40 C.F.R. § 1068.30.

The impacts on the oil and gas industry would themselves be significant. According to the U.S. Energy Information Administration ("EIA"), as of May 2019, Colorado had about 40,000 active oil and natural gas wells. EIA, "Today in Energy," (June 17, 2019), *available at* https://www.eia.gov/todayinenergy/detail.php?id=39993. Granting the Petition would have nationwide effects and would cause drastic changes in how Colorado and other states regulate oil and gas production facilities. Consistent with EPA's NSR permitting framework, other states' construction permitting programs consider post-construction, operational emissions when making major source applicability

determinations.[6]  Vacatur of EPA's certification of Colorado's NNSR permitting program would raise significant questions about the other states' regulations.

The Center focuses on emissions from drilling, hydraulic fracturing, and well completions, but its proposed interpretations of the Act and EPA's implementing regulations extend to other construction activities, such as construction of foundations and buildings.  *See* 5 Colo. Code Regs. § 1001-5:3:D.II.A.7.  These activities occur at stationary sources across many industries (manufacturing, power

---

[6] *See* New Mexico Admin. Code § 20.2.72.203(A)(3) (requiring a construction permit application to include estimates of "maximum quantities of any regulated air contaminants the source will emit through routine operations *after* construction, modification or installation is completed."); 30 Texas Admin. Code § 116.611(c) (requiring an applicant for a standard construction permit to certify that the maximum emission rates listed in the registration "reflect the reasonably anticipated maximums for *operation* of the facility"); 25 Pa. Code § 127.204(a) (aggregating "emission[-]generating activities resulting from *operation* of the new or modified facility" for purposes of determining whether special permit requirements apply); 11 Miss. Admin. Code Pt. 2, R. 2.2(B)(8) (requiring construction permit applicants to include in the application the "air emission rate for each air pollutant subject to regulation under the Federal Act that can be reasonably expected to be emitted into the air as a result of *operations* from the source"); 10 Mo. Code State Regs. § 10-6.020(2)(P)(38) (PTE "shall be based on the maximum annual-rated capacity of the installation assuming continuous year-round operation") (all emphases added).

sector, food and dairy production, to name a few), not just oil and gas, and the Center's proposed interpretation would force EPA and state regulators around the country to scrutinize and estimate emissions from all types of pre-operations activities at thousands of sources. In Colorado alone, the Air Pollution Control Division ("APCD") receives approximately 3,000 to 4,000 air permit applications each year across all types of industries. *See* In The Matter Of Proposed Revisions To Regulation Number 3, 5 CCR 1001-5, APCD's Economic Impact Analysis (Initial Analysis) for Regulation Number 3, Parts A, B, C, and D (January 5, 2023), *available at* https://drive.google.com/drive/u/0/folders/1HsTnETqC5T9YWhaxQA4ak cjb2atPwFZB at 3 (providing data for 2019-2021). The Center's arguments are contrary to the objective of the NSR program, which is aimed at emissions "following construction," not from pre-operation construction. *DTE Energy Co.*, 711 F.3d at 644.

## CONCLUSION

The Court should deny the Petition for Review.

Dated: January 24, 2023.

Respectfully Submitted,

*s/Christopher L. Colclasure*

Christopher L. Colclasure
BEATTY & WOZNIAK, PC
1675 Broadway, Suite 600
Denver, Colorado 80202
Phone: (303) 407-4499
Fax: (800) 886-6566
ccolclasure@bwenergylaw.com

*Counsel for Colorado Oil and Gas Association*

*s/John H. Bernetich*

John H. Bernetich
Jennifer L. Biever, *admission pending*
Corey Y. Lim, *admission pending*
WILLIAMS WEESE PEPPLE & FERGUSON PC
1801 California Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 861-2828
Fax: (303) 861-4017
jbernetich@williamsweese.com
jbiever@williamsweese.com
clim@williamsweese.com

*Counsel for American Petroleum Institute, Inc.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

(1)   This brief complies with the type-volume limitation of Fed. R. App.
      P. 32(a)(7)(B) because this brief contains 5,624 words, thus not
      exceeding the 6,500-word limit, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(f).

(2)   This brief complies with the typeface requirements of Fed. R. App.
      P. 32(a)(5) and the type-style requirements of Fed. R. App. P.
      32(a)(6) and 10th Cir. R. 32(a), because it has been prepared in a
      proportionally spaced typeface using Microsoft Word in 14-point
      Century Schoolbook font.

Dated: January 24, 2023.

*s/John H. Bernetich*

WILLIAMS WEESE PEPPLE & FERGUSON PC

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

*AMICI CURIAE* BRIEF OF AMERICAN PETROLEUM INSTITUTE, INC. AND COLORADO OIL AND GAS ASSOCIATION

(1)    all required privacy redactions have been made;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3)    the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus, Security intelligence version: 1.381.2658.0, last updated January 24, 2023, and according to the program are free of viruses.

Dated: January 24, 2023.

*s/John H. Bernetich*

WILLIAMS WEESE PEPPLE & FERGUSON PC

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished via the appellate CM/ECF system.

Dated: January 24, 2023.

*s/John H. Bernetich*
WILLIAMS WEESE PEPPLE & FERGUSON PC